Attorney for Plaintiffs:
**The Abrams Firm**
**John P. Abrams, WA Bar No.:**
310681401 Marvin Road, S-307
Olympia-Lacey, WA 98516
Telephone No.: 360-918-8196;
Facsimile No.: 855-820-2142
**Jack Duran, CA Bar No.: 221704,**
**Trial Counsel Jack Duran**
4010 Foothills Blvd. S-103, #98
Roseville, CA 95747
Telephone: 916-779-3316;
Facsimile: 916-520-3526
litigation@theabramsfirm.com;
jackduran@theabramsfirm.com

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Janice Degeus and Nancy Johnson; Jemaal Knox and Marlene Knox; Cameron Krug and Sarah Mescher; Kyoungah Lee; Friah Rogers; Teresa Sharp (fka Teresa Allred) and Mark Allred<br><br>**Plaintiffs,**<br>v.<br><br>WYNDHAM VACATION OWNERSHIP, INC; AND, RCI, LLC<br><br>**Defendants.** | Case No.3:19-cv-05325-VC<br><br>SECOND AMENDED COMPLAINT FOR AN EQUITABLE REMEDY FOR CONTRACT TERMINATION AND UNJUST ENRICHMENT REMEDY OR JUDICIAL RESCISSION REMEDY; AND FOR CALIFORNIA STATUTORY LAW AND RICO ACT VIOLATIONS AND COMMON LAW FRAUD<br><br><br><br>Demand for Jury Trial, FRCP 38<br><br>Date:<br>Time:<br>Courtroom:<br>Judge: |

COMES NOW, the Plaintiffs, by and through their counsel of record, Jack Duran, Esq. of The Abrams Firm, to complain of the above Defendants in this SECOND AMENDED COMPLAINT subsequent to the Defendants' Motion to Dismiss that was heard and ruled upon by this Court.

## I.     PARTIES

1.     The Plaintiffs were all were involved with timeshares sold by Wyndham Vacation Ownership ("Wyndham" including its' brand *Worldmark by Wyndham*) that is alleged to have defrauded the Plaintiffs in the sales transactions

2.     The other Defendant, RCI, LLC ("RCI"), was required by Wyndham to be the Plaintiffs booking service that is alleged to have conspired with Defendant Wyndham and defrauded the Plaintiffs in the frustration and prevention of the fulfillment of booking services, along with Defendant RCI's active participation to arrange meetings for upgrade contracts to be sold by Defendant Wyndham.

3.     RCI services were for room bookings and RCI and Wyndham are alleged to have conspired to make illicit profits by means of fraud in violation of the RICO Act.

4.     Plaintiffs all have substantially similar and thereby corroborative fact patterns with fraud schemes and tactics that are individually pled by the Plaintiffs with particularity at the end of this Complaint.

5.     The Plaintiffs have combined resources for $3500 times 6 contested contracts for the total cost of litigation as co-Plaintiffs facing a multimillion-dollar timeshare conglomerate.

6.     The Plaintiffs to this matter are as follows:

       Janice Degeus and Nancy Johnson are residents of the State of Utah:

       Jemaal Knox and Marlene Knox are residents of the State of Washington.

Cameron Krug and Sarah Mescher are residents of the State of California.

Kyoungah Lee is a resident of the State of California.

Friah Rogers is a resident of the State of Oregon.

Teresa Sharp (fka Teresa Allred) and Mark Allred are residents of the State of Arizona.

7.      RCI was a wholly owned subsidiary of Defendant Wyndham, but now RCI is an independent LLC entity and has raised a MTD without any claim of being a subsidiary to Defendant Wyndham. Defendant RCI is headquartered in New Jersey, and none of the Plaintiffs are residents of New Jersey.

8.      Defendant Wyndham has its Corporate Headquarters in the State of Florida, and none of the Plaintiffs are residents of Florida, thus preserving complete Diversity Jurisdiction of all the parties to this action.

9.      Should other natural persons or entities at Wyndham and/or RCI be discovered as relevant to this case, Plaintiffs shall seek leave to amend this Complaint for any doe persons and/or roe corporations as needed.

10.     Defendant names throughout this Complaint include all dba entities, assumed names, affiliates, subsidiaries, agents, employees, officers, directors, principals and trustees.


## I.      JURISDICTION AND VENUE


11.     Jurisdiction and Venue is sought for all of the California executed contracts as listed below:

      a)   Janice Degeus and Nancy Johnson purchased in Oceanside, California;

      b)   Jemaal Knox and Marlene Knox purchased in San Diego, California;

c)  Cameron Krug and Sarah Mescher purchased in San Diego, California;

d)  Kyoungah Lee purchased in Angels Camp (near Sacramento) California;

e)  Friah Rogers purchased in San Francisco, California.

f)  Teresa Sharp (Allred) and Mark Allred purchased in Oceanside, California.

12.     Six Plaintiff Contracts were executed in California by Wyndham and are subject to the California law pled herein and for fraudulent collusion under federal law.

13.     The above listed Plaintiffs sue in their individual capacity and in their capacity as spouses to the extent that any principles of Community Property law or other laws regulating marital property may apply to their joint assets or debts.

14.     Both Defendant Wyndham and Defendant RCI were served with accepted service for a California Legal Remedies Act Notice but declined to settle by their inaction. The matter was brought to this Court with out-of-state purchasers (plaintiffs) and has been consolidated to California purchases after Defendants MTD resulted a First Amended Complaint, replaced by this Second Amended Complaint.

15.     These matters are ready for adjudication under this Court's Jurisdiction and Venue.

16.     This action arises under California statutory law and under Federal law for the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 to 1968, as well as California common law and equitable relief remedies requested herein.

17.     This case involves two forms of Subject Matter Jurisdiction. There is a federal question (28 U.S.C. 1331) for RICO claims, and there alternatively is Diversity Jurisdiction (28 U.S.C. 1332) with one at least one plaintiff with over $75,000 in controversy, of which we have identified 2 plaintiff couples so far, and are still having information to further retrieve through discovery for one Plaintiff that is close to the threshold where we give a good faith estimate.

**Supplemental Jurisdiction**

18.     In Exxon *Mobil Corp. v. Allapattah Services Inc.,* 545 U.S. 546 (2005), it was held by the Court that only one Plaintiff has to meet the $75,000 threshold in a diversity case. Under 28 U.S.C. *1367,* Supplemental Jurisdiction is permitted to join claims that have not met the amount in controversy threshold.

19.     In *Exxon Mobil*, the Supreme Court traced the evolution of diversity jurisdiction and Section 1367. Reading the plain language of the statute, the Court reasoned that, if a District Court has original jurisdiction over the claim of one plaintiff, it has jurisdiction over the entire "civil action," including the claims of other plaintiffs with less than $70,000. To hold otherwise would be antithetical to the whole notion of supplemental jurisdiction that permits district courts to exercise jurisdiction over related claims. As a result,, it is easier to retain diversity multiparty and class actions in, as long as at least one plaintiff satisfies the $75,000 amount-in-controversy.

20.     In the case at bar, Plaintiffs Allred for example, have lost approximately $125,000 to date due to conduct of Defendant Wyndham and conduct of Defendant RCI in restricting and unavailability of bookings, and in being set up for upgrades.

21.     This Plaintiff would qualify the rest of the Plaintiffs for supplemental jurisdiction where Joinder here is on similar facts (similar fraud schemes as are labeled in headings in the Plaintiffs fact pleadings), and the same causes of action for all Plaintiffs.

22.     Another plaintiff couple well in excess of the amount in controversy is Mr. and Mrs. Knox who had $101,646.36 in estimated damages caused by Defendant Wyndham, and in collusion with bookings and upgrade meetings, Defendant RCI.

23.     And Friah Rogers is borderline to the threshold after all costs which must be discovered from Defendant Wyndham.

24.     Accordingly, this Court has subject matter jurisdiction over the RICO claim as a federal question (18 U.S.C. § 1961 et seq.), and the subject matter jurisdiction for diversity jurisdiction on some Plaintiffs, and joinder for the other Plaintiffs under supplemental jurisdiction.

25.     Additionally, the Court has subject matter jurisdiction on any of the California state law claims, be they statutory or equitable, which are raised in this case.

26.     This Court has jurisdiction and venue over this action pursuant to Article VI Section 10 of the California Constitution and California Code of Civil Procedure section 410.10.  The Court has personal jurisdiction over Defendants pursuant to California Code of Civil Procedure section 410.50 et seq

27.     Plaintiff is informed and believes, and on that basis alleges, that this Court has personal jurisdiction over Defendants because the transactions occurred within California at various sites of Defendant Wyndham's Hotel facilities located within California, which constitute jurisdiction for the events giving rise to the causes of action herein.

28.     Plaintiff brings their complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy for at least one plaintiff exceeds $75,000 in just expended financial losses to qualify for supplemental jurisdiction of the other plaintiffs (actually 2 of the plaintiff contracts are well over the $75,000 threshold [Allred estimated at over $125,000 and Knox estimated at $101,646.36], and those still subject to discovery, as in the case of Friah Roger, where the shifting amounts paid because of upgrades is requiring discovery to be sure if she is over or under the threshold).

29.     The above damages calculations do not include trebling the damages under the RICO Act, or consequential harm, or punitive damages split between only six plaintiff contracts, where all plaintiffs herein would be well in excess of the threshold.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   EQUITABLE RELIEF FACTS

30.   Wyndham is in the business of developing and selling vacation timeshares with grandiose promises that are entirely reduced to a "points" system required to be booked through a booking service, "RCI".

31.   RCI in turn imposes highly restrictive rules to artificially limit Plaintiffs' point use (i.e. restrict the booking of accommodations) and thereby frustrate or prevent use altogether to lessen costs and protect profits for its collusive partner Wyndham.

32.   RCI, additionally and actively made bookings designed for Plaintiffs herein to meet for Wyndham sales upgrade presentations, all in the furtherance of Wyndham's profits.

33.   The Plaintiffs are obligated with perpetual fees and high use costs that are both detailed in the Plaintiff Facts with Particularity at the end of this Complaint,

34.   Plaintiffs costs are between 1000% to 3000% [10 times to 30 times higher] with a 1566% average among the 6 co-plaintiffs that is 15 times more than what the public pays online the same day (not 11 months in advance).

**Denial of Legally Mandated Disclosure**

35.   All Plaintiffs herein, were denied disclosures contained in a State of California's very lengthy timeshare purchaser disclosure document: **California Public Report, Time-Share** ("**CPR**") which is legally mandated to be provided for review prior to the purchaser's contract signing.

36.   As per the State of California, DRE:

The Department of Real Estate (DRE) not only administers and enforces the laws governing the sale of subdivided lots and common interest developments, including condominiums and planned developments, it also administers and enforces laws governing the sale of time-share interests. Time-share interests in any time-share project, also known as a time-share plan, to be sold in California, whether the time-share plan is

located in California or in any other state in the United States, are subject to regulation under The Vacation Ownership and Time-share Act of 2004 (California Business & Prof. Code Sections 11210 through 11288). Before a developer may market or sell time-share interests in a time-share plan in California, the developer must obtain a public report issued by the DRE which discloses many important aspects of the time-share offering. **That public report must be presented to prospective purchasers <u>before</u> the purchase so they have an opportunity to read it before making a purchase decision**.  Emphasis added.

37.     None of the Plaintiffs read or reviewed such CPR disclosures prior to signing, therefore Defendant could not lawfully obtain any of the Plaintiffs' signatures to bind them in a contract.

## IV.     REMEDIES

38.     Plaintiffs seek relief from the documents signed and to remedy the harm of Defendant's engorgement derived from an assertion of an unlawful contract for the unjust enrichment paid to the Defendant and further for punitive damages awarded for overt and systematic violations of California law in order to deter future conduct and recalcitrant violations of this disclosure law.

39.     Plaintiffs seek equitable contract termination and/or rescission, for among other fraud & deceit that the Plaintiffs allege,  this a bright line rule provides the impetus for relief for the failure of providing the State of California Timeshare Disclosures that are required *before* entering a timeshare purchase contract in California.

40.     As a result, it would appear according to the CA DRE analysis in ¶36 above, that nondisclosure in defiance of the law and its impetus to protect consumers, would thereby bar the ability to make a lawful timeshare sales contract absent such disclosures.

41.     With such relief, the only remaining question would be for damages (restitution for unjust enrichment or a rescission remedy), including the amount necessary to deter future unlawful conduct assessed by a jury trial over punitive damages.

42.      Otherwise claims would surround the California timeshare statute and common law rescission for Bait & Switch Fraud (Fraudulent Inducement and Fraudulent Concealment).

43.     And, RICO claims would apply to the exclusive booking arrangement Plaintiffs were required to use and were presented with RCI by Wyndham's sales staff as a third-party booking entity named "RCI".

44.     RCI was a subsidiary of Wyndham, but now is a separate LLC, and a party to fraud, and as a third-party this collusion for profit through fraudulent means constitutes a conspiracy between two or more Actors to obtain monies by unlawful means.

45.     This clandestine manipulation of the reservation system's impediments to bookings was very profitable to sharply curtail expenses by means of fraud and deceit, where all Plaintiffs herein have pled highly limited bookings, or no use in given years, despite huge expenditures and future obligations for the privilege of vacation "ownership".

## CALIFORNIA PUBLIC REPORT, TIME-SHARE
## EQUITABLE RELIEF

Improper Notice of California Public Report (CPR) - Applies to All Plaintiffs

46.     This matter is streamlined with a bright-line statutory rule regarding disclosure of a CPR that could be applied to all Plaintiffs in this action wherein they were by law entitled to:

**The right to receive, and to review, a California Public Report before Plaintiffs signed or entered into on a timeshare contract.**

47.     This relief would apply to all Plaintiffs herein who have each purchased a timeshare in California where a bright-line rule has been violated, thus permitting the Court to grant equitable relief to rectify the violation of statutory mandates. *See Fact Pleadings at end.*

48.     The "contracts" can be terminated as a matter of law, because they should never have been lawfully entered into or signed absent the mandated disclosures.

49.     Where a Termination or Rescission remedy can be granted without foreclosing additional and further remedies, Punitive Damages may still be put forward for a Jury to decide if a Defendant had recalcitrant conduct in defiance of California law, and such conduct is potentially harmful to other consumers or defiant or pervasive or systematic, such that the conduct itself should be subject to an amount of Punitive Damage sufficient enough to deter the Defendant's future conduct.

50.     The focused task of the Jury would be limited to the standard of assessment to punish and deter future conduct for CPR failures of lawfully imposed consumer disclosures.

### ALTERNATIVE GROUNDS - COMMON LAW RESCISSION
Unconscionable Successor Liability - Applies to All Plaintiffs

51.     A common-law right is specifically supported by Plaintiff Facts pled in the particular at the end of this Complaint, showing that none (0) of the Plaintiffs would have signed contracts which latently harbor obligations to their successor family members and future generations to force payment of unpaid mortgages and ever-rising maintenance fees, had the Plaintiffs known that *successor lability existed* in their contracts—a fact which was absolutely known by Defendant Wyndham.

52.     Not one of the Plaintiffs herein, had any knowledge whatsoever, that there was liability for their children (if none, siblings) to pay financial obligations owed to Defendant Wyndham. *See "Successor Liability" subheadings contained in the Plaintiff Facts.*

53.     Defendant often called the timeshare interest "property" or "real estate" to the Plaintiffs at the point-of-sale, which would be a valuable "asset" and discussed how Plaintiffs could transfer the asset amongst family members.

54.     However, upon later revelation often by a lawyer, the Plaintiffs discover that their children (if none, then siblings) are all jointly and severally liable under the sales contract for any timeshare related debts owed to the resort.

55.     And real-world consequences (as Testimony of such victimization by Defendant Wyndham shall show), means that an Owner's family successors-in-interest would be forced to pay the debts of their deceased parents or else wage a legal battle against a multibillion dollar corporation without a living witness to the fraud, which would appear to be a harsh and *Unconscionable* outcome.

56.     Since the Plaintiffs did not have a Will at the time that included this interest, it was a *future* contract being advised upon by Defendant's non-lawyers, for Plaintiffs to enter into *someday* (a Will, or a Codicil), when at all times Defendant's staff knows that the timeshare sales Contract being signed in the room *that day*, would absolutely determine the obligations owed to Defendant Wyndham with terms completely unknown to Plaintiffs lurking in that sales Contract imposing automatic liability upon those same family members that were being beneficially discussed by Defendant's staff.

57.     This "successors" term of the Contract, for each & every Plaintiff herein, caused an unconscionable result which appears actionable for Contract Rescission through common law fraud relief, and thus within the powers of this Court to remedy.

ALTERNATIVE GROUNDS - COMMON LAW RESCISSION
Unconscionable Cost per Use - Applies to All Plaintiffs

58.     Plaintiffs herein all share an unconscionable result caused by sales inducements where saving money on vacations, claimed luxury use benefits, profitability and investment value, in

then end are all discovered as falsehoods, and the true ultimate *cost per use* which Plaintiffs receive is astronomically high (if they could book uses at all, as some Plaintiffs could not).

59.     The saving of money for booking vacations, is highly divergent from actual outcomes, where Plaintiffs lose somewhere between several hundred percent, or up to a 1000% or more, and one Plaintiff herein pays 3000% more than the public pays online. *See ¶56(c) and Fn. 1.*

60.     Because of Wyndham's clandestine control of RCI (unknown by any of the Plaintiffs herein until later revelation by a lawyer), it was extremely difficult to find availability, and for some it was impossible to book (i.e. no Use, so pure profit for Defendant Wyndham).

61.     For the Plaintiffs that could book, they ended up with:

      i.      subpar motel-like rooms that were contrary to promised 5-star hotels and resorts;

      ii.     unwanted locations because they were the only "available" bookings; however,

      iii    noting, there an exception when Plaintiffs were targeted for an Upgrade Meeting, referred to as "Owners Meetings" (see **¶55(i)** below) where RCI would then find availability in Wyndham's resort chain for its parent, Wyndham to obtain profits.

47.     Since the promised profits from selling or rental income were later discovered as false and deceptive, there were no promised "profits" to offset the exorbitant costs.

48.     Accordingly, an extremely harsh and absurd *cost per use* emerges in all of the Plaintiffs' fact patterns that are *Unconscionable* common law fraud that can be remedied with Judicial Rescission relief for all Plaintiffs herein. *See, ¶56(c) below; also see, Fn. No. 1, and Plaintiffs Facts under the header: Cost per Use [the last section in each fact pleading].*

## V.     FRAUD FACTS

49.     Plaintiffs all share similar encounters with Defendant. Plaintiffs were on vacation at or near a Wyndham Resort. Each was enticed to attend a short resort ownership presentation.

50.     What ensued was a 2-hour to 6-hour ordeal of deceptive sales-oriented activity, where Wyndham's staff engaged in tactics designed to manipulate consumers to purchase claimed valuable "real property" with at 4-star and 5-star luxury hotels for a week or more each year included with the timeshare purchase.

51.     Plaintiffs were typically not allowed to use their cell [smart] phones, or to leave to eat or have time alone, and they were not allowed to read the contract or associated documents.

52.     False promises and concealments (see, **55(a) - 55(i)** below; were made by Wyndham through its sales persons, management and contract closers, all with the intention of inducing Plaintiffs to make a purchase that day, which every Plaintiff in their facts has pled never would have been done absent bait & switch fraud and had the true contract terms and the liabilities owed been disclosed in an *open light*.

53.     With disclosure of material facts, not one of the Plaintiffs would have contracted with Defendant as is evident in each Plaintiff's particularized facts patterns hereinbelow.

54.     Instead, the Plaintiffs herein were deceived and believed the false statements made by Wyndham's staff, and relied upon such statements to their unfortunate detriment.

55.     To induce a sale that disclosure in an open light would not have produced, the Plaintiffs were given false and misleading information by Defendant Wyndham sales teams (and to book upgrade meetings, by Defendant RCI's representatives) which has been listed in categories of fraud schemes pursuant to 'a' through 'i' below, and the later discovery of the fraudulent inducements and/or concealments by the Plaintiffs is denoted by the corresponding subheadings (in bold below) showing the truth of the matters falsely asserted.

//

//

## **SUBSTANTIVE ALLEGATIONS**

**(a)**   WVO ownership is a good "investment" that always go up in value (appreciation).

**(b)**   WVO ownership is valuable as a long-term asset that can be resold for a "profit".

**Value (a-b)**:   No market value; no resales; thousands have not sold on eBay for $1.00.


**(c)**   WVO's maintenance fees don't go up at all or only very little and other fees do not exist.

**Fees (c):**   Maintenance Fees exist and have regular increases, up to 150% to 300% herein.


**(d)**   WVO ownership is a valuable asset and a legacy the Owner "could" put in a Will.

**(e)**   Owners (Plaintiffs) "can" decide (optional) who will receive the timeshare in their Will.

**(f)**   Plaintiffs were not told about "successors" liability after demise within their Contract.

**Wills (d-f)**:   Plaintiffs did not know that despite any possible future contract to make a Will (or Codicil), the WVO Contract being fully executed that day, would bind all their children as "successors" to be jointly & severally liable for ever-increasing *Multi-Generational* debt.


**(g)**   WVO's staff sold anytime, anywhere, easy to book 5-Star resorts and hotels worldwide.

**Use (g)**:   Bookings are restricted to 11 months (exceptions if targeted for an Upgrade; *see "i"*) in advance (Online is same day), but promised destination locations and 5-star resorts are not available, as evidenced by actual and repeated attempts to get what the Plaintiffs paid for.


**(h)**   Plaintiffs can make "rental" income to pay the mortgage, fees and sometimes a profit.

**Rental (h):**   Plaintiffs can't book rooms for themselves, so rental is impossible as promised.


**(i)**   "Upgrades" are often suggested/booked by RCI (costing $1000s - $10,000s) to resolve a prior deficiencies created by WVO (often repetitive, where the problem is never fixed).

**Upgrades (i):**   Upgrades always increase (often double) yearly fees and add thousands to mortgage balances, but never seem to solve the problem, thus requiring future upgrades.

56.      All Plaintiffs have a strong correlation of similar fraud schemes, along with the

following 3 commonalities occurring to all Plaintiffs:

(a) **All Plaintiffs did not receive notice of the CA "Public Report, Time-Share".**

(b) **All Plaintiffs did not receive any notice, at all, of latent Successor Liability.**

(c) **Plaintiffs, because of huge high-interest mortgages, high annual fees and restricted RCI use, would pay about 800% to 3000% more than online.** [1]

_____

**1**   **Plaintiffs Cost per Night and Percentage over Online Booking in the same order as the Plaintiff Facts \***
Degeus & Johnson: $4,750/ night or about **3000%** higher than booking online;
Knox: $2,916/night or about **1300%** higher than booking online;
Krug & Mescher $4,000/night or about **1600%** higher than booking online;
Lee: $2,500/night or about **1200%** higher than booking online;
Rogers: paid $4,498 in extra fees (last good trip) and a **1000%** estimated for others;
Sharp & Allred: $2,000/night or about **1300%** higher than booking online;

\*   Please note that the calculations herein are rough approximations (especially cases of no documents provision or missing documents), however after Discovery, the Plaintiffs shall have the ability able to provide exact figures.

\*\* The <u>average cost</u> of our Plaintiffs to book a room via RCI as a Wyndham "owner" is **<u>1566%</u>** more than online.

_____

57.     Defendant's sales and management, systemically support a fraud strategy to make buyers think they have a real property, with ownership benefits like a Home.

58.     Despite a reference to specific room number and specific week of the year in what looks like a deed, this is subterfuge, as Plaintiffs cannot by right stay at that resort, let alone that week number or room number, and the document is used by Defendant as a sham device to deceive timeshare purchasers into thinking they own a valuable "real estate" investment.

59.     Wyndham staff told the Plaintiffs herein that they own "property" with rights similar to a Home: (a) resale value; (b) appreciation; (c) rental income; and for some "equity" built into the purchase.

60.      "Points" are used up for service fulfillment, which uses RCI as the booking service and/or international booking service that is required for the Plaintiffs to book a room.

61.     However, the booking service fulfillment through RCI, actually heavily restricted or completely prevented the Plaintiffs' ability to book a room.

62.     Plaintiffs' "points" are definitely involved in the booking service in accordance with RCI's highly restrictive rules, but the "Deed" is not involved in booking rooms.

63.     "Points" are merely numerical figures where the amount is one factor to book use, subject to rules that are purposely and with intent to make profits, designed by RCI and Wyndham to be highly restrictive, including the frequently claimed, "no availability" by RCI, and its obtuse rules (such as, 11 months for advance booking)

64.     Since the promised profits for resale and rental income said to be a sure thing by Defendant's staff, were false and deceptive, the entirety of the arrangement is reduced to a pure *Service Contract,* albeit poor quality and over-restricted, even if they paid 1000% or more than the public pays to book online (**¶56(c)**; and, **Fn. 1** *figures*).

65.     Defendant did not provide proper [statutory] legal disclosure of a CPR under applicable law, nor unconscionable family liability terms and extra fees charged for use (for "owners").

66.     Any of these the three grounds raised in ¶56(a)-(c), could support Judicial Rescission.

67.     These grounds support Termination or Rescission based upon statutory relief or common law fraud, and are all derived from the Facts raised in this Complaint, including the pleadings with particularity at the end of this Complaint.

## VI.   PRIVATE ATTORNEY GENERAL ACTION

68.     Claims presented in this Complaint are under the California Private Attorney General's Act, California Civil Code, Section 1021.5 et seq., entitling Plaintiffs to attorneys' fees because this litigation is brought in the public interest and confers a benefit upon the public.

## VII.   CALIFORNIA LEGAL REMEDIES ACT

69.     Plaintiff attempted settlement with Defendant under the California Legal Remedies Act, however, Defendants did not respond at all. This would entitle the Plaintiffs to attorney fees, but that is not necessary if the Private Attorney General Action or other statute provides such fees.

# COUNT ONE

## RICO ACT

(Applicable to both Defendants)

70.   The Federal Racketeer Influenced and Corrupt Organizations Act (RICO) found at 18 U.S.C. §§ 1961 to 1968 is the interplay alleged herein in many sections including the Fact Sections and the Plaintiffs facts with particularity located at the end of this Complaint.

71.   Through Discovery the facts of this relationship shall become clearer, where now what is readily ascertainable has been alleged herein.

72.   Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

73.   Defendant violated RICO and Plaintiff was injured as a result.

74.   Each Defendant violated 18 U.S.C. 3 1962 by the acts described in the prior paragraphs, and as further described below herein and in the Plaintiffs Facts with particularity

75.   An enterprise within the meaning of 18 U.S.C. 3 1961 of persons engaged in the conduct through a continuing pattern of racketeering activity. The conspirators of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the pattern of racketeering activity.

76.   Here Defendant RCI held itself out to the public and Wyndham owners was held out by Defendant Wyndham to its owners as a separate entity.

77.   And, Defendant RCI is in fact a separate independent booking services entity to many other timeshare resorts of every size including many of the major billion-dollar resorts.

78.   There may also be members of the enterprise who are unknown at this time but may be discovered and named by amendment.

79.     Alternatively, the defendant companies each constitute a separate enterprise within the meaning of 18 U.S.C. 3 1961.

80.     Alternatively, the defendant companies together constitute an enterprise within the meaning of 18 U.S.C. 3 1961.

81.     Each enterprise has engaged in, and their activities have affected, foreign commerce.

82.     Each Defendant, and any natural persons associated with them, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. 1961 and l962.

83.     The racketeering activity was made possible by the co-defendants' regular and repeated fraud upon the same timeshare owners, and the upgrade sales bookings (revenues) and booking services prevention (costs) of the enterprise.

84.     Defendants each had the specific intent to engage in the substantive RICO violation alleged herein.

85.     Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. 1961, as more specifically alleged below. Defendants each committed many of such acts on each Plaintiff, or else aided and abetted such acts.

86.     Acts of racketeering were not isolated, but rather the acts of Defendants were related in that by the same or similar purpose and result, and use of coordinated methods of commission involving the same participants, as the Plaintiff-fraud victims herein.

87.     Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a substantial period of time as derived from the collective facts of the Plaintiffs herein, and is continuing to the present, and there is a continued threat of repetition of such conduct upon other future victims.

88.     The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of supplying timeshare services contracts to the Plaintiffs and other consumers in Wyndham brand timeshares and as major hotelier all the way down to Days Inn, Travelodge and Super 8 Motels  (Defendant Wyndham), and its' co-conspirator in the world leader in providing booking services for timeshare resorts (Defendant RCI).

89.     Defendants have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity such as ownership of resorts, hotels and motels for public accommodation (Wyndham) and booking for other resorts, including large timeshare conglomerates (RCI).

90.     Plaintiff specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as herein alleged in detailed factual overlay for each Plaintiff (below).

91.     None of the Plaintiffs knew, prior to an attorney recently telling them and pursuant to this litigation, that RCI was at one time a wholly owned subsidiary of Wyndham the parent company of the Plaintiff's resort.

92.     Before and after RCI turned into RCI, LLC as an independent entity, RCI held itself out to the public as an independent booking entity.

93.     Before and after RCI turned into RCI, LLC as an independent entity, Wyndham staff held RCI out to the public, including its' timeshare purchasers, as all Plaintiffs herein, as an independent booking entity.

94.     This was a deceitful concealment of the subsidiary acting to defraud the parent's clients in terms of booking services fulfillment and creating and manipulating conditions to set up revenue-generating upgrade meetings.

95.     By concealing a relationship where RCI deceived owners in booking restrictions and availability, Plaintiffs who spanned those years were unaware of the Parent and Subsidy acting in concert as one to defraud the Plaintiffs.

96.     Now through two separate entities, the co-defendants conduct the same activity, to defraud consumers herein and conspire to make a profit through fraudulent means sounding under the RICO Act.

97.     These acts used fraud tactics and strategies to cut costs and increase sales [upgrades].

98.     The Conspiracy between Defendant Wyndham and Defendant RCI is that Wyndham forces the Plaintiffs to use Defendant RCI for bookings where, by design with Defendant Wyndham, its' co-conspirator,  Defendant RCI, frustrates bookings (like 11 months for advanced booking requirement), and/or  completely denies bookings (no availability).

99.     This collusive action either reduces owner use costs (forced to go to other less desirable destinations and/or forced to take inferior accommodations), or this collusion eliminates the costs which is the case when there is no booking availability or an impossibility from one or more of the restrictive systems imposed.

100.    A universal restriction typically preventing all use in the first 12 to 18 months was the 11-month advanced booking requirement Plaintiffs herein experienced that assured there was no use until a year or more after the purchase (despite promises of "anytime" use), effectively making more than a year of required mortgage payments and resort fees with absolutely no use, by design of the Co-Defendants.

101.    The associated use and bookings facts concerning this collusion for profit between Defendant Wyndham and Defendant RCI, are detailed in the way they occurred to each Plaintiff, as pled by all of the Plaintiffs to this matter (following below).

102.    For each of the Plaintiffs there are RICO-specific pleadings with particularity, with the interplay between, Defendant Wyndham's use promises and Defendant RCI's fulfillment performance, and how they relate to each Defendant's liability for RICO Act claims that are alleged herein.

103.    The consolidated RICO facts hereunder show the underlying collusion to make profits through conspiring and actively committing acts of Fraud by Defendant Wyndham to induce purchases with grandiose use promises to be fulfilled through Defendant RCI, and Fraud by Defendant RCI to deny and/or frustrate use bookings for the Plaintiffs herein, and to create upgrade revenue meetings for Defendant Wyndham.

104.    In each of the cases, Plaintiffs face restrictions and non-availability (while booking rooms on the Internet is freely available) that show evidence of the conspiracy to frustrate and/or deny use through Defendant RCI's restrictive practices and methods, where Plaintiffs are required to book as required by Defendant Wyndham, where Defendant RCI is the sole booking company to be used by the Plaintiffs.

105.    It is thought upon information and belief that Defendant RCI has booking services assigned under alias names under certain conditions as ordered by Defendant Wyndham, such as the name "Worldmark" to book rooms would actually be an RCI staff person.

106.    The fact patterns below make that assumption, but even if it were not the case, it seems at a minimum in all the cases herein, the Plaintiffs had to use RCI for international bookings, and for others for all U.S. and international bookings.

107.    In each of these matters the Plaintiffs were promised use rights by sales staff and Wyndham Management that were fraudulent in order to induce a sale.

108.    In the sales process, RCI is sold to the consumers as a benefit for priority access to worldwide resorts and hotels and sometimes plaintiffs were told about RCI savings on cruises and flights through the use of points.

109.    As part of the conspiracy to frustrate and/or deny bookings, it is believed that Defendant RCI is informed by Defendant Wyndham what destinations and accommodations (or dates) that were desired for an owner's bookings (Plaintiffs herein), and thereby RCI can strategically plan the frustration and/or prevention of use requests.

110.    Under some conditions, there is an upgrade planned by the collusive co-defendants herein, where the Plaintiff is sent by Defendant RCI to a Wyndham resort with the intention of Wyndham procuring an Upgrade Contract.

111.    At a minimum, each Plaintiff had fraudulently induced use promises from Defendant Wyndham, followed by the subsequent attempts at use fulfillment through Defendant RCI that were strategically planned between the two Defendants to be frustrated and/or prevented, thereby saving Defendant Wyndham substantial money for lower (or no) use costs,

112.    This conspiracy between Defendant Wyndham and Defendant RCI harmed the Plaintiffs in the full amount of damages pled for each Plaintiff, plus treble damages as could be permitted under the RICO Act.

//

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***Facts Related Collusion to Reduce or Eliminate Use Costs and to Make Upgrade Profits***

***Janice Degeus and Nancy Johnson***

113.    Janice Degeus (67) and Nancy Johnson (63) are sisters ("Plaintiffs" herein) that originally purchased a timeshare with Worldmark by Wyndham in 2006 and they were upgraded by sales staff while vacationing at their home resort in Oceanside, California in 2017.

114.    However, in 2018 through 2019, Plaintiffs had evolving revelations of mistruths at the 2017 point-of-sale, where the Plaintiffs began to discover that they were victims of fraudulent promises, some of which were involving use and availability through Defendant RCI.

115.    Defendant RCI had booking restrictions and availability limitation where the point-of-sale use promises were later proven to be untrue.

116.    Since RCI books the Plaintiffs, it can book them decent accommodations at the Plaintiffs' home resort, a Wyndham resort, for purposes of having an "owner's Meeting" that was to assist the Plaintiffs in bookings, which quickly decayed into a 3-hour, high pressure upgrade sales presentation and rapid signing.

117.    Wyndham staff assured Plaintiffs that with the upgrade Plaintiffs would be able to book cruises and get airline tickets included with their points, this all was presumably through Defendant RCI booking services.

118.    Wyndham sales representative "Ryan" told the Plaintiffs that the new upgrade would provide enough points to equate to an extra week of vacationing every year, however upon attempting to book that was not honored.

119.    Plaintiffs were told by Defendant Wyndham that now that they would have extra points with the 2017 upgrade, and with so many points left over they could easily rent out their extra

points and get annual income as a result, but later on bookings though Defendant RCI would

cost more in points.

120.    Wyndham Managers told the Plaintiffs that through RCI they could book worldwide

luxury accommodations at their disposal whenever and wherever they desired to travel.

121.    These destinations were all 5-star accommodations, in exotic locations like "Fiji" and

"Hawaii" and worldwide luxury accommodations were available through Defendant RCI at no

extra cost just by buying the 2017 upgrade.

122.    Wyndham representatives assured Plaintiffs that the points could cover not only the

room, or cruises if they wanted, but also the cost of airline tickets too.

123.    Plaintiffs learned much later that with Defendant RCI's assignment of value to the

points, luxury accommodations, international travel and perks like airfare that they were

promised by Defendant Wyndham for the points they owned, under the points' valuation by

Defendant RCI would not be enough for promised bookings [without airfare].

124.    The points under Defendant RCI's assignment of value to the points, would barely cover

the cost of a downgraded room.

125.    Ultimately, there was no availability in the specific places that the Plaintiffs desired and

were promised, even when attempting to book many months in advance.

126.    This had a correlation where imposed restrictions were specifically placed on the

Plaintiff's known booking needs in a booking process that the Plaintiff is required to do.

127.    The only use booking since the upgrade was far from: up to 2 weeks in a 5-star

international hotel, airfare included as promised by Defendant Wyndham would occur through

RCI, as it was only a stay in Midway, Utah only for a couple nights for a double occupancy,

which is what their points use valuation was reduced to by Defendant RCI.

128.    Plaintiffs are elderly and unable to put up with the headaches of the highly restrictive [illusory] booking windows imposed that were used by Defendant RCI in their particular case.

129.    In the 2 years since the upgrade, Plaintiffs could only book 1 average Midway, Utah room for 2 nights.

130.    This is definitely not the two weeks at high-end, exclusive international destination resorts (like Fiji…), as promised by Defendant Wyndham would be possible through the booking services of Defendant RCI.

131.    Plaintiffs have now discovered that the general public online has better availability than Worldmark "owners" and specifically including booking attempts and under-quality offerings through Defendant RCI.

132.    In essence, the Plaintiffs investment in the timeshare ownership was without any financial benefit to booking online.

133.    The Plaintiffs' desired locations were actually far less bookable, not bookable, including Plaintiffs' booking efforts through Defendant RCI.

134.    At the Plaintiffs' current use rate through Defendant RCI since the upgrade, factored over the 10 years of the mortgage, while taking into consideration the PayPal and Visa deceivingly used for additional payments to Wyndham, along with their then-current mortgage, and the maintenance fee that grew by $400% and will continue to rise, the Plaintiffs would have been paying a total cost of approximately $95,000 over 10 years.

135.    At their current use-rate permitted by Defendant RCI's systems and procedures, which was for 2 nights in 2 years, that amounts to about $4,750 per night.

136.    And the public can book a room online with vast selections, and in 1 day, versus a Wyndham owner booking through Defendant RCI up to 11 months in advance.

137.    Alternatively, Defendant RCI made the Plaintiffs try to fit into an illusory booking window that is without availability, as these Plaintiffs were asked to attempt this procedure, but that did not work.

138.    The Plaintiffs are Worldmark by Wyndham Members that are called Worldmark "Owners" by sales staff, but are required by Defendant RCI's restrictions, systems and procedures to pay about 3000% more ($4750 per night) than the general public pays online.

139.    The Plaintiff endured frustration of the central purpose of a timeshare use agreement—to book rooms—due to the booking agent, Defendant RCI—a booking facilitator that operated here to tactically frustrate and block booking access.

***Facts Related Collusion to Reduce or Eliminate Use Costs and to Make Upgrade Profits***

***Jemaal and Marlene Knox***

140.    Jemaal Knox and Marlene Knox ("Plaintiffs" herein) purchased a timeshare with Worldmark by Wyndham in 2010 followed by promises for better Use privileges made in their May of 2012 upgrade in San Diego, California

141.    Plaintiffs were promised that they would have access to other timeshare locations with high-quality resorts and hotels through Defendant RCI.

142.    These promises later proved to be untrue through Defendant RCI.

143.    enduring continuous pressure from Wyndham reps and Management,

144.    After sales tactics regarding use features at the last upgrade presentation that lasted about 6 hours, the Plaintiffs agreed to purchase another upgrade to improve use.

145.   In a completely fabricated claim of auto-cancellation, the Plaintiffs were told by Defendant Wyndham's staff (Reps and Worldmark by Wyndham Management) that in order to protect ownership (the investment and use rights), in the previous investment made in ownership, they were forced to act immediately.

146.   Their timeshare was threatened to cease that night on December 31st 2012, so the Plaintiffs had to upgrade by that night.

147.   To protect their investment since 2010 and their resale value, Wyndham staff emphasized that the upgrade was the only alternative and was necessary and with it came increased use rights as was promised by Wyndham staff.

148.   Though Wyndham representatives had described the renting as a very simple process, Plaintiffs only later discovered that it is impracticable to rent their out their timeshare in the way described by Defendant's staff.

149.   Plaintiffs were disappointed that the use booking through Defendant RCI wasn't as good as it was promised by Defendant Wyndham, and the rental process was extremely difficult.

150.   Wyndham representatives and management promised Plaintiffs with the upgrade all their previous problems with use bookings through RCI would be solved.

151.   Plaintiffs discovered that this was not possible to book because of rules and availability imposed by the booking service through Defendant RCI, and despite the money invested, the Plaintiffs were still met with unavailability and low-grade lodgings.

152.   In the ten years of ownership, Plaintiffs were able to book about 6 vacations using their timeshare.

153.   The locations offered by the booking agent, Defendant RCI, were not the high-end, destination resorts as promised by Defendant Wyndham's Worldmark sales staff.

154.    In essence, the Plaintiffs "investment" in timeshare ownership was without any financial benefit, and because of the booking results (restrictions and non-availability), booking with Defendant RCI was far more costly than booking online, and far more restrictive, where online would have been as simple as selecting a desirable hotel and paying for it, even for the same-day.

155.    If the Plaintiffs continued their current use-rate as permitted by Defendant RCI through its frustration of availability and restrictions to get 6 stays over the 10 years, and booked just one room for a week for each time, while taking into consideration the rising maintenance fees high interest rates, and down payment, the Plaintiffs would have paid a total cost of about $105,000 over 10 years.

156.    That amounts to $17,500 for each 6-night week.

157.    That Wyndham owner cost is reflective Defendant RCI's restrictive booking practices and procedures, and ends up costing the Plaintiff  about $2,900 per night, for a room that books to the public for about $225 a night, at the nicest resort the Plaintiffs were able to book during their vacations.

158.    Thus, the public can book a room online in 1 day (versus 6 months or more in advance through Defendant RCI) with vast selections (versus non-availability through Defendant RCI) for about 1300% less money than Wyndham "Owners" must pay.

***Facts Related Collusion to Reduce or Eliminate Use Costs and to Make Upgrade Profits***

***Cameron Krug and Sarah Mescher***

159.    At a Wyndham presentation in California, Cameron Krug (26) and Sarah Mescher (28),

("Plaintiffs" herein) signed a vacation room use contract for about $36,000 (principal only, plus

high-interest and maintenance fees that may total $90,000.00 over the 10-year mortgage period)

on July 29, 2018.

160.    The Plaintiffs did not want to pay extra expenses (Mr. Krug is an accountant), but the

Wyndham staff said they would save significant money, where they falsified the true costs and

omitted known expenses on a handwritten piece of paper used during the presentation (known

in the industry as a Deal Sheet that has all the discussed figures and abbreviated words for key

facts with arrows, but never leaves the room, meaning no Plaintiff copies).

161.    It appeared the Plaintiffs would have an annual prepaid vacation where they saved

money, when they were actually paying a lot more for rooms than they previously had paid

online prior to buying Wyndham's room booking program.

162.    Wyndham staff also said that there would be no maintenance fees because of the

"Wyndham credit card" used to make monthly payments under the installment contract that had

use rewards which would offset all maintenance costs.

163.    Wyndham staff demonstrated how it would be more cost-effective to purchase the

timeshare than to book vacations in the typical manner online.

164.    This demonstration used falsified figures for the math and use destination promises

written on the slip of paper at Plaintiffs' table (Deal Sheet, see ¶2), but  such information was

not in the Plaintiffs' written contract.

165.    Plaintiffs believed that the Wyndham employees had expertise and knowledge in

vacations obtainable through the Wyndham Worldmark booking program.

166.    It is thought that Defendant RCI handles the bookings for Worldmark customers for their Worldmark bookings on behalf of Worldmark and as "RCI" for international bookings.

167.    Plaintiffs were shown pictures by Defendant Wyndham/Worldmark of specific resorts and hotels that the Plaintiffs would be entitled to book in the U.S. and all over the world through Defendant RCI, specifically including areas of travel interest to the Plaintiffs located in New Zealand, Ireland, and Italy stating that Plaintiffs could book these specific international destination hotels and resorts through "RCI".

168.    20.    Plaintiffs actual ability to use the timeshare after the purchase was rendered impossible due to a consistent and unyielding lack of availability when attempting to book (even lower grade accommodations) in the promised destinations through Defendant Wyndham's booking agent, "RCI"

169.    21.    Wyndham staff never disclosed that Wyndham previously owned the now independent booking agent, RCI, LLC.

170.    Defendant Wyndham's Contract documents with the Plaintiffs refer to RCI as an:

"**external exchange company**"

171.    Defendant "RCI" is held out to the public as a separate entity by Defendant Wyndham through its sales staff and Wyndham's Management.

172.    All of the Plaintiffs' attempts to book a room with this Wyndham timeshare have failed because Defendant RCI consistently claims that accommodations are never available.

173.    Defendant Wyndham Reps claimed that purchasing this timeshare would grant Plaintiffs high trade value through RCI, but Defendant RCI has not produced any bookings at all.

174.    Defendant Wyndham employees at the presentation promised flexibility to roll points over or borrow from an upcoming year's points through the RCI program, but RCI restricts this.

175.    Plaintiffs have not found the timeshare to be flexible to book through the required booking agent, Defendant RCI.

176.    Due to the collusive efforts of the Co-Defendants to restrict the booking of rooms otherwise available to the public, the Plaintiffs have been unable to secure any booking since their purchase.

177.    Plaintiffs later discovered hidden booking costs through RCI.

178.    Wyndham staff failed to inform Plaintiffs that membership and use of RCI would be necessary in order to book stays at the international locations described at the point-of-sale.

179.    Plaintiffs were consistently denied by Defendant RCI, any availability to book a room for a week every year with their points.

180.    Wyndham booking promises, proved unattainable, as were even downgraded efforts, through Defendant RCI's booking system, even though Plaintiffs would be asked to pay $90,000.00 for what amounts to a use-benefit of zero.

***Facts Related Collusion to Reduce or Eliminate Use Costs and to Make Upgrade Profits***

***Kyoungah Lee***

181.    Kyoungah Lee ("Plaintiff" herein) purchased a timeshare through Worldmark by Wyndham in April 2017 in Angel's Camp near Sacramento.

182.    She attended a sales presentation for what was portrayed as not a traditional timeshare, but it was a new type of use program that was a *Membership with "vacation points"* where it appeared everything was included for members like international travel flights and cruises.

183.    On Wyndham's sales staff, a sales representative named "Glen" and a Wyndham manager named "Izzy" (who stated that he worked there *forever* and seemed kind of like a

Grandfather), answered all of Plaintiff's questions and made promises [mistruths] that seemed as if the Plaintiff was making a smart and financially responsible decision, because in addition to the beneficial use promises, the Plaintiff could make money, and whenever needed she could cancel the Membership at any time, just like a *Gym Membership*.

184.    During 3 hours of sales, Wyndham sales staff convinced Plaintiff that by signing up on that day, she would be able to use her points at all Wyndham resorts at *anytime*, and at *anywhere* in the world *including overseas locations*.

185.    And, Plaintiff was told by Defendant Wyndham's Worldmark sales team that she could also use the points for discounts and priority bookings on cruises too, because Wyndham had "partnered" with "RCI"  which was described as an outside company, for cruise deals and to assure priority booking availability at 5 star resorts, accessible all over the world.

186.    None of the use rights or cruise related promises were true, and Plaintiff relied on these deceptions to make a purchase decision.

187.    Plaintiff was also told by Defendant Wyndham's Worldmark staff that her points would never expire and she could roll them over to save them up even "until she was an old lady".

188.    Plaintiff specifically asked: *So, you're saying if I don't use these points, they accrue, and I can go anywhere I want*. Which without exception, was confirmed by Wyndham's staff.

189.    It is thought that Wyndham's bookings are done by RCI staff.

190.    Plaintiff was promised amazing customer service at the point-of-sale, but when the Plaintiff tried to book a vacation, the customer service was awful.

191.    Every location and date Plaintiff tried to book was full (no availability), and when she called the individual Wyndham resorts or hotels, she was told that they do not handle bookings

and she would need to call the general Wyndham booking number, where she was already told nothing was available.

192.    Plaintiff also discovered that her points expired and if she wanted to roll them over, she would need to pay a large fee. This did not comport with the promises at the point-of-sale, where rollover was automatic, and forever ("until she was an old lady"), where no charges were ever discussed, despite the Plaintiff's highly specific questions.

193.    When Plaintiff looked into booking the overseas locations through Defendant RCI, as was required by Defendant Wyndham's Worldmark Agreement, she found out that she did not have enough points for the promised resorts and could not afford to pay for them.

194.    Additionally, Plaintiff was never informed that the international locations booked through Defendant RCI would require an additional membership fee. At the point-of-sale, she was told she owned Membership rights to stay anywhere that Wyndham had resorts or hotels, which were described as worldwide.


### Facts Related Collusion to Reduce or Eliminate Use Costs and to Make Upgrade Profits

### Friah Rogers

195.    Friah Rogers ("Plaintiff" herein) had an existing Wyndham timeshare for many years with her deceased husband that they had bought from a friend, but while in San Francisco this 76-year-old widow was upgraded into a novation contract in 2018.

196.    Plaintiff's "upgraded" timeshare gave her points to use at Worldmark locations, but she understood that to mean she owned adequate points for the locations and hotels that they discussed in the sales presentation with Wyndham staff.

197.    However, the use rights promised were done through the booking service that is thought to be Defendant RCI handling bookings for Defendant Wyndham, where booking restrictions (such as year-long advanced booking requirements) and lack of availability, restrict and prevent the customer's desired use bookings.

198.    Through this restrictive booking system, the only bookings available were substantially different than sought and hard for the Plaintiff to accept. Such facilities offered were less costly for Defendant Wyndham to provide.

199.    Under such conditions pursuant to paragraph 3 above, the availability denials and obtuse restrictions would have been orchestrated in collusive planning between Defendant Wyndham and Defendant RCI.

200.    Plaintiff was invited to attend an "Owner's Update Meeting" in Depoe Bay, her home resort, and since she wasn't getting the bookings originally envisioned, she was pleased to attend a meeting *designed to help her get better use* out of her "Worldmark vacation investment".

201.    A very friendly Worldmark sales representative told Plaintiff that she could trust him to make all of her vacation dreams come true, and this was backed up by Wyndham Management, as a Manager with purported high authority told her they were timeshare experts and to trust her rep to lookout for her best interests.

202.    Plaintiff was told she needed more points and the *Diamond Elite* status in order to book the accommodations she desired at any time all around the world, frequently, and with no extra costs, along with increased amenities.

203.    Trusting Worldmark sales staff and feeling immense pressure, Plaintiff agreed to upgrade her timeshare, but the next booking attempt through Defendant RCI was restricted and availability required a Hotel not in San Francisco where she had UN convention meetings as an Oregon Delegate, but a huge distance from the city in Windsor, in Sonoma County, CA.

204.    Worldmark sales staff pushed Plaintiff to upgrade to the *Diamond Elite* level, promising that it would give Plaintiff a huge amount of points to use on more vacations and more availability in booking, alleviating any deficiencies in her prior upgrade purchase expectations.

205.    Worldmark staff and Management discussed and showed Plaintiff locations in "Hawaii" and "New Zealand" and showed her pictures of their luxury resorts and highly rated hotels all over the world and told her that those would all be available through the bookings, and for no extra costs with her upgrade, and Plaintiff was also promised by Defendant Wyndham that she could book the rooms less than a month before she wanted to travel.

206.    However these representations of the Diamond Elite booking status were not honored by Defendant RCI, that conversely made impossible to navigate obstacles to booking anywhere in the entire city of San Francisco or any contiguous or even nearby suburbs (Windsor is North of Santa Rosa and hours of Highway 101 bottleneck to San Francisco, but it was all RCI offered the Plaintiff under her Diamond Elite status that in execution through Defendant RCI is worthless.

207.    Worldmark sales staff said that Plaintiff could bank her points as she liked, without mentioning any form of restrictions, and trade them through RCI, however Defendant RCI imposes restrictions and costs upon the Plaintiff's banking of points.

208.    Plaintiff was told that the properties she would be able to stay at in the pictures she was shown, were 5-star resorts and hotels that were "only accessible by Wyndham owners" and that she was to book them through Defendant RCI.

209.    Plaintiff thereafter was told by Defendant RCI that the upgrade did not the ability to book in San Francisco for the UN Convention which is precisely what she needed and was promised to be able to book by the Co-Defendant, Wyndham.

210.    Plaintiff was told by Defendant RCI that she still needed to book more than a year in advance (versus "a month" at the point-of-sale).

211.    All of the locations Worldmark had shown her that were "included with" the Diamond Elite statues (with no costs), were only available through RCI (which unknown to Plaintiff was a Wyndham subsidiary originally and is now alleged as a RICO conspirator) and required additional fees and costs that made them cost prohibitive to this recent fraud victim.

212.    Plaintiff went online and found out that "exclusive" bookings she was promised by Wyndham were readily available online (yet availability was denied by Defendant RCI) and could be booked immediately without any advanced [year-long] booking requirements, and could be freely booked by anyone in the general public all over the Internet booking sites with immediate availability.

213.    Plaintiff, a 76-year-old widow (73 to 75 at the time of some costly upgrades to what was a paid-in-full interest that she had been content to just get the use from in her twilight years), trusted Worldmark sales staff and Worldmark Management and was upgraded multiple times in the course of about two years 2016-2018.

214.    After the Worldmark purchase, Plaintiff went to New York for a weekend prior to a

United Nations meeting (she is the United Nations delegate representing Oregon, but the UN

did not pay for this prior weekend accommodation), and while there she thinks that she was sold

a Club Wyndham [separate] timeshare in 2016.

215.    She thinks she used this for 1 weekend and she was again upgraded to a California

timeshare in 2017 for $52,000 that was discounted thousands because of the existing New York

timeshare, making it a $46,000 mortgage (which is about $110,000 estimated after calculating

the high-interest over 10 years, plus maintenance fees, which she cannot remember how much

they are).

216.    As a consequence, for about $110,000 in 2017 obligations, she has only one booking

(not at the requested "three stars or higher" , but at another hours out-of-the-city hotel North of

Santa Rosa, CA) and she was required to attend another sales meeting, despite being a

Wyndham owner.

217.    It seems that little actual Use-value has been derived from this over $100,000 obligation,

where the Plaintiff was taken advantage of, as she already owned a Worldmark, plus its upgrade

and the underlying New York Wyndham.

218.    Significant, is that later in 2017 when the Plaintiff was upgraded from New York to

California, she was on her own trip paid out-of-pocket for a vacation in San Francisco and

agreed to an "owners meeting" where she was actually requested that Wyndham take back its

timeshare as she was previously assured was an option because she did not receive the Use

promises by Wyndham through the booking process thought to be Defendant RCI.

219.     So when the Plaintiff was actually attempting to divest the New York timeshare she clearly didn't need any more money spent on Wyndham timeshares (even when she was there, the United Nations paid for her accommodations) and just wanted what she had in Oregon (the Worldmark) which was itself costing her too much with rising fees.

220.     Wyndham's Manager said he had authority to move her [which translated to an Upgrade costing more money] from New York to a San Francisco 3-star hotel, the "Wyndham Canterbury",  that was closer to Oregon and she was told she could book it whenever she needed, and that if she didn't use the San Francisco property, she could always rent it out [predicated on the ease of booking through RCI] because of this desirable San Francisco location.

221.     Tragically, when Plaintiff attempted to actually book San Francisco, there was no availability, and she even attempted several different trips and times, but what was thought to be obstacles placed by Defendant RCI's booking staff, never worked, and ultimately she was told, $100,000 in obligations or not, she did not have enough points to book the hotel in San Francisco that she was specifically promised, and the only way that would happen is that she would have to upgrade.

222.     Since the Plaintiff couldn't book the hotel for herself, and she could not rent as promised either, it turned out that the *zero cost and extra profits to be made* promise by Defendant Wyndham's Management, was later proven to be false for what is thought to be efforts through Defendant RCI in its overreaching denial of booking availability, especially under its elongated and artificial advanced booking requirements.

- 38 -

*Facts Related Collusion to Reduce or Eliminate Use Costs and to Make Upgrade Profits*

*Teresa Sharp (Allred) and Mark Allred*

223.    Teresa Sharp (Allred) (the Plaintiff herein) and Richard Mark Allred (collectively the "Plaintiffs" herein) purchased a timeshare through Worldmark by Wyndham in 1999, and Teresa Allred ("Plaintiff" in the singular herein refers to her) was the only purchaser on the last novation contract purchase in Oceanside, California in 2016 and she was the main purchaser throughout the years that started when she was in her 20s.

224.    Since purchasing the original timeshare, the Plaintiff has upgraded nine (9) times.

225.    Most recently, while vacationing at a booking set up through Defendant RCI for a 2016 stay, Plaintiffs were also set up by RCI in this process for a check-in that included the need to have an owner, Teresa Allred, attend a short "Owner's Meeting." Such upgrade events started with the RCI booking at a nice Wyndham resort where they have sales facilities for upgrades.

226.    Wyndham staff told Plaintiff throughout the 2 hours about the amazing discount she was receiving and the wonderful destinations she could use by rising to a new level with the new points being offered.

227.    Plaintiff was told of the many things Plaintiff she could book with the new points presumably through Defendant RCI.

228.    Wyndham staff told Plaintiff she could use the points to book flights, cruises, safaris, and European villas, and finally get the use she deserved from all the prior purchases at this new level of ownership.

229.    Plaintiff was assured that she would be able to book vacations easier with this upgrade and she wouldn't have any of the previous problems she had experienced.

230.    Wyndham representatives sold the Plaintiff on the fact that these exclusive resorts she would now have access to, would always have rooms available for Wyndham vacation owners at her level, and again presumably through Defendant RCI's booking services.

231.    Since signing the original contract in 1999, between 2011 and 2016, Plaintiff was pressured into upgrading 9 times for bigger and better use rights.

232.    Plaintiff was booked, by the booking agent thought to be Defendant RCI, to a nice Wyndham resort in Oceanside California which was set up with an undisclosed requirement to attend a meeting.

233.    Plaintiff was threatened with loss of her investment, especially the 9 upgrades since 2011, unless she upgraded, and Wyndham advised that she would also receive fantastic use benefits with this Wyndham conversion in the 2016 upgrade.

234.    It is estimated, subject to discovery on the full amounts paid which may be higher, to be over $125,000 that was spent on these timeshare purchases with hundreds of thousands of dollars in obligations remaining for principal, interest, and fees over a ten-year mortgage span based upon saving the prior investment (a fabrication) and the only positive benefit was the use rights gained though the point bookings though RCI.

*235.*    Consequently, this harm upon the Plaintiffs has been by both Co-Defendants, wherein Defendant Wyndham's fraud is supported and furthered and collusively planned in conjunction with Defendant RCI.

236.   Plaintiff was told by Defendant Wyndham's staff, that when she did the 2016 upgrade, it would finally be easy to book rooms wherever and whenever she wanted.

237.   This "wherever, whenever" assurance later proved to be untrue in practical attempts with Defendant RCI.

238.   When trying to book vacations the Plaintiff was told by Defendant RCI that there was nothing available and it would require 13 months' advance booking notice.

239.   While trying to book vacations through Defendant RCI in the exact same tropical destinations that she was promised in 2016, like "Fiji" and "Hawaii" the Plaintiff was told when she tried booking 13 months out through Defendant RCI, that not only was there no availability, but also that the "waitlist is completely filled" for those locations.

240.   In practice, because of the constant non-availability through Defendant RCI (despite availability online) and because booking these destinations through Defendant RCI was an impossibility because the "wait list" fills up and there is no new people even for future years, Defendant RCI has eliminated use at these destination, while its partner in collusion sold the Plaintiff herein a timeshare that requires using Defendant RCI for such bookings.

241.   When the Plaintiff looked into booking some international destinations promised by Defendant Wyndham like Paris, she discovered through Defendant RCI that there were no available resorts in Paris or within the surrounding areas.

242.   As a result, Plaintiff has been unable to book any of the vacations through Defendant RCI that she was specifically promised by Defendant Wyndham would be available through

Defendant RCI's "wherever, whenever" booking procedures for her new level of ownership in the 2016 novation upgrade contract.

243.    While the Plaintiff has been able to book some vacations over the years, they frequently were not at the exact location or time she desired, and involved a number of months of advance booking and purchasing additional points, and largely, all the rooms were motel-like.

244.    The Plaintiff had been specifically promised that the new 2016 upgrade would cure all the past use problems.

245.    Later discoveries have shown that Defendant RCI has blocked the ability of the Plaintiff to obtain the promised bookings because Defendant RCI's system makes it impossible to book.

246.    Plaintiff has already paid Wyndham over $125,000 through the last upgrade.

247.    The new Mortgage then was about $75,000 with an obligation of $1,500 per month including Maintenance fees just under $2,100 per month [and rising], which is a total obligation of over $200,000 total costs to be paid over a 10-year mortgage period for the 2016 upgrade.

248.    **Conclusion:**  For all the Plaintiffs herein, the use commensurate with the amount of money expended and obligated would be vast amount to use for online bookings, however, due to the restrictive practices and booking procedures, Plaintiffs received very little use.

249.    Plaintiffs allege acts of fraudulent concealment and active fraudulent misrepresentations were used in concert between the two Defendants in this case to obtain monies from the each of the Plaintiffs herein.

250.    These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme for profits derived from fraud.

251.    Plaintiff has been damaged as a direct and proximate result of Defendants' continuation of their scheme.

252.    Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured the Plaintiffs herein, constituted a course of conduct these Plaintiffs spanning a period of years for all the Plaintiffs though the present, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means.

253.    Therefore, said violations were a part of a pattern of racketeering activity violating the RICO Act.

254.    The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs.

255.    Plaintiffs seek an award of damages in compensation for, among other things, the money obtained by fraud that Defendants obtained from Plaintiff and Plaintiffs accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.


**COUNT TWO**

**CALIFORNIA TIMESHARE ACT**

(Rescission and Punitive Damages - Applicable to all Plaintiffs)

256.    Plaintiffs incorporate by reference all the preceding paragraphs (including the Plaintiff Facts supplemental that has been incorporated by reference in the preceding paragraph) as though fully set forth herein.

257.    Choice of Law principles permit federal district courts to apply the substantive laws of any state, including the state of general jurisdiction (California) in order to provide remedies.

258.    California's *Vacation Ownership and Time Share Act of 2004* applies to the case at bar to all Plaintiffs herein, because Wyndham owns numerous hotels and resorts in California, some of which is where Plaintiffs purchased their timeshare or subsequent upgrade.

259.    All of these California timeshare properties are offered to the Plaintiffs herein as an "accommodation" pursuant to California law. *See*, *BUSINESS AND PROFESSIONS CODE – BPC, DIVISION 4, REAL ESTATE [11000 – 11288] CHAPTER 2. The Vacation Ownership and Time-Share Act of 2004 [11210 – 11288], Article 1 General Provisions [11210 – 11219], cited in this Count as the "Act", and on-point to this paragraph, at §11211.5(a)(1) which states that the Time-share Act is applicable to:*

> Time-share plans with an accommodation or component site in this state [California].

*260.*    Wyndham also sold the Plaintiffs points to be used in a booking service by RCI to access hundreds more hotels and resorts in California as "component sites" physically located in the State of California. *Act at §11211.5(a)(1) and known by definition under §112112(g) as:*

> "Component Site" means a specific geographic location where accommodations of a multisite time-share plan are located.

261.    Defendant Wyndham sold the Plaintiffs timeshares under a marketing system known under California law to be a "multisite time-share plan".  *See, Act at §112112(z)(2)(B)*. Such points use exist in the written Contracts between Wyndham and Plaintiffs that are known by California law as:

> (z) "Time-share plan" means any arrangement, plan, scheme, or similar devise... [with] the right to use accommodations.... A timeshare plan may be either of the following:
> ...

(2) A "multisite time-share plan," which includes either of the following:
…

(B) A "nonspecific time-share interest," which is the right to use accommodations at more than one component site created by or acquired through the time-share plan's reservation system, but including no specific right to use any particular accommodations.

262.    Further, Wyndham has a central booking "reservation system" that it is thought all Plaintiffs must use for all bookings and other for some bookings, as part of Defendant's "multisite time-share plan" where the Plaintiffs are required to go through Defendant's booking agent "RCI", whose Parent Company used to be Wyndham (a subsidiary of Wyndham), but it is now an independent company alleged in conspiracy for profits obtained through fraudulent means planned and conducted between the Co-Defendants herein (RICO Act violations).

263.    RCI handles the central reservations for Wyndham's multisite plan that Plaintiffs are required to use to attempt to make bookings for accommodations or component sites in the multisite time-share plan sold to Plaintiffs. *See, "reservation system" at §112112(u), stating:*

"Reservation system" means any method, arrangement, or procedure by which a purchaser, in order to reserve the use or occupancy of any accommodation of a multisite time-share plan for one or more time-share periods, is required to compete with other purchasers in the same multisite time-share plan….

If a purchaser is required to use an exchange program as the purchaser's principal means of obtaining the right to use and occupy accommodations in a multisite time-share plan, that arrangement shall be deemed a reservation system.

264.    The Facts of the Plaintiffs are replete with actual experiences that demonstrate the primary purpose and function of RCI's reservation system is to frustrate, obstruct and deny bookings on behalf of its parent corporation, Wyndham, where "owners" pay many tens of

thousands, even hundreds of thousand as documented herein, for paltry bookings in degraded

facilities and/or substandard accommodations.

265.    These are unfair and deceptive systems and strategies used  to perpetrate sales fraud by:

(a) <u>high interest loans</u> (often doubling the principal amount); (b) <u>ever-rising, multigenerational

fees</u> (and hidden use fees), and to avoid expenses,  (c) <u>RCI use execution that is substandard,

and sparse to nonexistent</u>, such that "*owners*" are in practice, *victims* of abusive sales practices

and predatory lending.

266.    The operations and acts of <u>all</u> Defendants (including RCI) qualify for coverage under the

Act (see ¶262 - ¶265 above), where subsection 11285, provides:

> An action for damages or for injunctive or declaratory relief for a violation
> of this chapter may be brought by any time-share interest owner…. Relief
> under this section does not exclude other remedies provided by law.

267.    Defendant Wyndham owns a substantial amount of California resorts and hotels,

including the resort/hotel properties in the Northern California District where Plaintiffs herein

had their most recent purchase or upgrade, and a large amount of hotels, resorts, and chains, in

California, including Days Inn, Howard Johnson, Ramada, Travelodge and even Super 8 Motels

are all owned by Wyndham.

268.    Thus, Defendant Wyndham is under the Act as owning "accommodations"

geographically within the State of California.

269.    By its acts and practices as herein described, Defendants in (a) - (f) below violated the

Act in multiple ways:

(a) Defendant Wyndham violated §11225 & §11238 by failing to provide certain documents

and certain disclosures clearly and conspicuously as required by law;

(b) Defendants Wyndham and RCI violated §11237 by failing to make proper disclosures as required by law with regard to the incidental benefits offered to the Plaintiffs;

(c) Defendants Wyndham and RCI violated §11245 by making material misrepresentations, including, but not limited to misrepresentations in connection with the promotion of a time-share plan, the nature, qualities and/or characteristic of the offered time-share plan, and/or incidental benefits;

(d) Defendant Wyndham violated §11265 by charging assessments in amounts not proscribed by law, or by failing to provide proper notice regarding the increase of assessments;

(e) Defendants Wyndham and RCI violated §11265 by failing to deliver on certain items within the time represented to the Plaintiffs;

(f) Defendant Wyndham violated §11265 by including conflicting, misleading and/or unlawful provisions among the various documents provided to the Plaintiffs;

270.    Plaintiffs herein have suffered great financial losses and have been harmed by Defendant's intentional and deceptive acts, which comprise precisely the type of conduct the California Legislature sought to protect all consumers from when it enacted the Time-Share Act of 2004.

271.    Based on the foregoing, Plaintiffs request contract rescission, damages, including Punitive Damages, and any other available remedies.

**COUNT THREE**
**COMMON LAW FRAUD**

(Rescission and Support for Statutory Punitive Damages - Applicable to all Plaintiffs)

- 47 -

272.    Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

273.    Acts of both Defendants (Wyndham and RCI) evidence Fraud.

274.    Defendant's staff engaged in high-pressure (and sophisticated hybrid sales tactics) through sales presentations that were designed to induce Plaintiffs to make a significant financial decision in a short time span based upon false information.

275.    Defendant's representatives intentionally misrepresented certain material facts as referenced in the Plaintiff's Facts section.

276.    Defendant's representatives knew (as this was their training) that their representations via tactics and fraud schemes detailed herein, were false and misleading.

277.    Specific examples of these fraud schemes are set forth in Section III Facts and its component of Plaintiff Facts at the end of this complaint which is pled with particularity therein.

278.    Defendant's sales and management stated falsities intentionally for the purpose of inducing Plaintiffs to enter into contracts to pay many thousands in purchase funds and future obligations, and collusively with RCI, eradicate expenses (restricted use/nonuse).

279.    Plaintiffs herein were also deceived with hidden contract terms that were concealed with active misrepresentations to the contrary, such as ever-rising maintenance fees which transfer to successor family members and future generations, evidencing blatant *Unconscionability*.

280.    Defendants' staff members were acting as agents of the Defendant entities in this matter, and the acts of the staff are attributable to Defendant, because they were performed in the course of work, and trained, directed and managed daily by Defendants' Management that is involved from the inception of hiring agents, through their education in the fraud schemes and refinement in tactics and strategies, including daily execution designed to defraud consumers.

281.     For all the reasons set forth herein, the Plaintiffs became induced to purchase a timeshare interest from Defendant Wyndham by means of fraud & deceit.  The false representations of material facts, combined with the high-pressure sales pitches, deceptive contracting procedures, defective [or absence of] disclosures, and frustration and refusal of preexisting duties for booking services, as well as profit schemes, strategies and tactics to obtain secondary upgrade contracts, were all used to separate the Plaintiffs from their money in exchange for substantially less than what was promised.

282.     Because of *Unconscionability*—the absurdity and harshness exemplified by paying up to 1000% more for a room than before they contracted  -and-  Multi-Generational debt liability—the sales contracts between the parties should be Rescinded, and then permit this Court or a Jury to award damages, including Punitive Damages that are warranted for the intentional, deceptive and fraudulent acts of the Defendants.

**COUNT FOUR**

**<u>BREACH OF CONTRACT</u>**

283.     Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

284.     To the extent that there is not full tort and/or statutory relief granted to certain Plaintiffs of this action, they are entitled to a finding of breach of contract.

285.     As pled herein with specificity for fraud, Defendant enticed Plaintiffs by promising that owning a timeshare would allow them to specific use benefits to plan vacations easily for less money than the non-owner in the public could book them for, and how Plaintiffs were making an "investment" in real property that the owner can make money from future rental and resale, which was a defining and persuasive benefit as the basis for the bargain.

286.    Plaintiffs were in fact told that they should buy their "property" because of the benefits and value associated with the "Deed". However, as an Owner of Defendant's timeshares, there are absolutely no real property rights, and it is not at all "just like a home" as described by Defendants sales staff Management and Contract Closers.

287.    Most if not all Plaintiffs experienced great difficulty in planning vacations and reserving accommodations with the RCI, and Wyndham timeshares are ultimately valueless in the common marketplaces, as they harbor significant debt, including escalating, recurring fees.

288.    In addition to any post-contracting breaches that have occurred since the sale, Defendant induced Plaintiffs by using many tactics and [contract misrepresentation] schemes pled in the particular herein, in which each such act of misrepresentation, concealment and/or other acts of deceit, shall serve to evidence breaches of the underlying Contract, and in all cases herein, those breaches shall serve to evidence Breach of Contract due to Contract Misrepresentation.

**COUNT FIVE**

**<u>NEGLIGENT MISREPRESENTATION</u>**

289.    Plaintiffs incorporate by reference all the preceding paragraphs, as though fully set forth herein.

290.    Plaintiffs seek rescission of any contract and further damages and relief pursuant to the Counts above.  In the alternative, to the extent needed for any Plaintiff's relief that is not eligible for Fraud/Rescission or a statutory remedy, Plaintiffs are entitled to recover damages for the negligence of the Defendants.

291.    Specifically, the salesmen made false or at least negligent representations of highly material facts (value, salability, debt obligations, inheritance and the fundamental use

privileges), as shown in the Facts, Section, including the Plaintiffs' pleading in the particular. *See, Plaintiff Facts supp.*

292.    Plaintiffs reasonably and justifiably relied on such representations by Defendant's staff.

293.    This reliance was to the detriment of Plaintiffs who paid substantial funds and were defrauded. *See,* 56(c); *also see,* FN 1: *an average of 1566% more cost than online bookings.*

294.    Plaintiffs' down payments, high-interest mortgages debts and increasing fees were paid as a direct and proximate cause of Defendant Wyndham's and Defendant RCI's predatory and abusive misrepresentations.

295.    At the time the misrepresentations were made, Defendant's representatives knew that they were overtly false or were at least were negligently made. *See, Facts described in* Section III and the Plaintiff Facts supp. detailing the misrepresentation schemes.

296.    Defendant's staff and its subsidiary, then co-conspirator Wyndham/RCI, deceived and frustrated and/or prevented use of points by Plaintiffs intentionally, or at least negligently.

297.    As a result of these intentional, or at least negligent misrepresentations, the Plaintiffs herein have been harmed by Defendant's staff, its management, and its booking company

298.    Specifically, Defendant RCI prevented Plaintiffs from obtaining bookings (which is the purported purpose of a timeshare contract) by preventing the realization of use promises made by Defendant Wyndham's staff, where Defendant RCI was provided by Defendant Wyndham the specific booking(s) desired in order to plan and design obstacles to deny the booking(s).

299.    And both of the Defendants to this lawsuit would consequently be liable for damages that the Plaintiffs herein are entitled to, including Punitive Damages.

300.    Plaintiffs herein have suffered great loss financially and have been harmed and have been distressed emotionally, some with physical manifestations.

301.   Finally, some Plaintiffs have additional negligent harm from medical injury and/or exacerbation, where such harm can be ignored by this Court if the same Plaintiffs were to receive a rescission at a minimum, and the possibility of damages, possibly punitive in nature, or to have a Jury evaluate Punitive Damages under this lawsuit.

# PLAINTIFF FACTS

# PLED WITH PARTICULARITY

**Pleadings for the following Plaintiffs**:

Janice Degeus and Nancy Johnson; Contract No. # 00022005901

Jemaal Knox and Marlene Knox; Contract No. # 00201948448

Cameron Krug and Sarah Mescher; Contract No. # 00203514872

Kyoungah Lee; Contract No. # 203363987

Friah Rogers; Contract No. # 00203271984

Teresa Sharp (fka Teresa Allred) and Mark Allred; Contract No. # 00006062248

# PLAINTIFF FACTS WITH PARTICULARITY

*Janice Degeus and Nancy Johnson*

1.   Janice Degeus (67) and Nancy Johnson (63) are sisters ("Plaintiffs" herein) that originally purchased a timeshare with Worldmark by Wyndham in 2006 and upgraded while vacationing at their home resort in Oceanside, California in 2017.

2.   However, in 2018 through 2019, Plaintiffs had evolving revelations of mistruths at the 2017 point-of-sale, where the Plaintiffs began to discover that they were victims of fraudulent

promises (some of which were involving use booking restrictions and availability through

Defendant RCI) and these promises were later proven to be untrue.

### *Upgrade Sales Presentation*

3.      The day after checking into their hotel, the Plaintiffs were aggressively told that they

needed to attend a "short" Owner's Meeting, and they resisted but were pursued for multiple

days saying they must attend to be sure their children received this valuable asset, so they

agreed to a short meeting.

4.      Unfortunately, the "short" meeting was long, and Plaintiffs were subjected to a high

pressure 3-hour presentation, depriving them of valuable vacation time with their family to get

to Disneyland (hours away).

5.      The 3 hours of aggressive sales tactics were exhausting the Plaintiffs to the point where

they had to sign just to get out of there and get their grandchildren to Disneyland.

6.      Upon arriving, Plaintiffs were told to turn off their smart phones and they were placed

on a separate table by a Wyndham representative.

7.      Throughout the presentation Plaintiffs expressed their disinterest and reluctance to buy

any upgrade.

8.      Plaintiffs told Wyndham staff they couldn't afford to upgrade and weren't happy with

their current ownership.

9.      With each refusal Wyndham staff would return with explanations as to how the upgrade

would solve all their problems and sometimes offered a lower price.

10.     Wyndham staff assured Plaintiffs that with the upgrade Plaintiffs would be able to book cruises and get airline tickets included with their points.

11.     Wyndham sales representative "Ryan" told the Plaintiffs that the new upgrade would provide enough points to equate to an extra week of vacationing every year.

12.     Wyndham sales representatives never disclosed to Plaintiffs that there were high fees as part of the upgrade that the Plaintiffs would be required to pay each year.

***Predatory Sales Practices***

13.     Plaintiffs were told that this was a great opportunity for vacations with Worldmark by Wyndham and because of the upgrade they were assured to have a "valuable asset" for their children to inherit someday.

14.     Despite the good deal, the Plaintiffs still conveyed their disinterest in buying any sort of upgrade multiple times over the course of many hours, and each time the representatives would come and tag-team them with fast-talking explanations of more features in a very high-pressure fashion, which exhausted and wore down the Plaintiffs' attempts at resistance and in the end they gave-in to the pressure.

15.     When the Plaintiffs continued to assert they couldn't afford the upgrade because they had no money for the down payment and they both were on limited incomes, the Wyndham staff aggressively said *don't worry about the costs* because there were PayPal and Visa accounts that could cover it.

16.     Wyndham [falsely] told the Plaintiffs that *Visa rewards* would pay for the first 6 months of payments.

17.     However, Plaintiffs did not accept either financing option and when money came up again, only a new Mortgage was discussed after that point.

18.     Plaintiffs did not know that since the reps *simply mentioned* the payment options, that meant Wyndham would automatically open PayPal and Visa accounts in the Plaintiffs' names.

19.     In the end, reps had signed the Plaintiffs up for a $6,000 PayPal account and a $5,000 Wyndham Visa (Barclays Bank on the back in fine print) without any authorization.

20.     Thus, without Plaintiffs' consent or understanding, Wyndham reps without the debtor's authorization, opened a PayPal account and a Worldmark Visa account by means of an interstate wire transaction.

21.     Plaintiffs were tricked and were unable to understand the debt Wyndham representatives were signing them up for at the time.

22.     Wyndham for some time after the upgrade, sought to keep upgrading the Plaintiffs, and continued with *multiple* phone calls *per day* to the Plaintiffs urging them to upgrade again.

***Value – Costs, Resale and Rental***

23.     When Plaintiffs purchased their membership their maintenance fees were approximately $75 a month, $900 annually.

24.     In the 13 years since owning the timeshare, their maintenance fees have risen (drastically with the 2017 upgrade) to over $300 per month, $3,600 annually.

25.     Despite questions, Wyndham representatives did not disclose any maintenance fee increases to Plaintiffs at the time of the 2017 upgrade purchase, and the discovery of this very substantial increase was not until late 2017 with the Plaintiffs' maintenance fee bill.

26.     The Wyndham representatives, including Management, assured the Plaintiffs that they were getting a great deal, that was below market value, and as such, it was only available for that day.

27.     The representatives also led the Plaintiffs to believe that should they ever change their mind and wish to get out of the upgraded Contract it would be "easy to sell" because the resorts and hotels they would be staying at had "exclusive use by Worldmark Owners" that is highly desirable to purchasers, so it would always sell very rapidly.

28.     And since the Plaintiffs were paying well under market value, such a sale would make them a good profit too, with the staff, including Wyndham Management, consistently stressing that this was an *investment* that far outweighed the costs because the Plaintiffs' prices were *grandfathered-in*, and the Plaintiffs could always just call to Wyndham and get back *at least* what they put in.

29.     When Plaintiffs called Wyndham and attempted to sell their timeshare back, Wyndham representatives gave them such a low offer, it amounted to pennies on the dollar, but even that *offer* is thought to be a deception because the Plaintiffs were required to pay-off the Mortgage first, where this has happened to other Wyndham owners and they still were not let out.

30.     Plaintiffs were told that now that they would have extra points with the 2017 upgrade, with so many points left over that they could easily rent out their extra points and get annual income as a result.

31.     However, Plaintiffs attempted to rent their timeshare points several times and were never successful.

*Use - Bookings*

32.     The Plaintiffs were reluctant to sign up for a timeshare upgrade since they weren't sure it would give them the vacations they wanted or that they could afford it.

33.     However, there was literally hours of continued reassurance from Wyndham Managers that began to wear them down, like luxury accommodations at their disposal whenever and wherever they desired to travel.

34.     These destinations were all 5-star accommodations, in exotic locations like "Fiji" and "Hawaii" and worldwide luxury accommodations were available through Defendant RCI at no extra cost just by buying the 2017 upgrade.

35.     Wyndham representatives assured Plaintiffs that the points could cover not only the room, or cruises if they wanted, but also the cost of airline tickets too.

36.     Unfortunately, the Plaintiffs learned much later that the easy international travel and perks like airfare that they were promised would occur through bookings with Defendant RCI, would barely cover of a downgraded room cost, and ultimately there was no availability in the specific places they were promised, even when attempting to book many months in advance due to imposed restrictions on their specific booking needs through the process the Plaintiff is required to endure with Defendant RCI.

37.     The only use booking since the upgrade was far from: *up to 2 weeks in a 5-star international hotel* (or included airfare) as promised by Defendant Wyndham would occur through RCI, as it was only a stay in Midway, Utah only for a couple nights for a double occupancy, which is what their points use was reduced to by Defendant RCI.

38.     Plaintiffs were sold an immaculate vacation experience that they could use with ease and peace of mind, but in reality, their tens of thousands in obligations for an "upgrade" was a *downgrade* to set them up for another upgrade.

39.     In reality, Plaintiffs are elderly and unable to put up with the headaches of the highly restrictive [illusory] booking windows imposed that were used by Defendant RCI in their particular case, and they are devastated by all the false promises, particularly with the lies about optional inheritance used to entrap their family.

40.     While staying at the Midway, Utah hotel that they managed to book, Plaintiffs also discovered that the promises of "exclusivity" were false. The hotel was packed with people who had booked on Travelocity and other online sites and clearly were not Worldmark owners.

### Contract Signing

41.     After 3 hours of high-pressure sales tactics the Plaintiffs agreed to purchase the upgrade.

42.     Nanette Haye, a [non-lawyer] Quality Assurance Officer, rapidly interrupted the contract terms and prompted the Plaintiffs where to sign on the Contract.

43.     Within minutes of agreeing to the purchase (that took a relentless 3 hours), the Plaintiffs were rushed through the entire Contract, with cursory explanations of all the terms and directives of where to sign in a matter of minutes.

44.     Wyndham closer, Nanette, controlled the flow of the documents throughout the process and didn't allow the Plaintiffs any time to read the documents on their own.

45.     She kept saying, you talked about this with Ryan, so I won't go over that, just sign here.

46.     Plaintiffs were not given time to read the Contract's content on their own and were not given adequate time alone to discuss their situation.

47.     The next day, while trying again to get their grandchildren to Disneyland, Nanette approached Plaintiffs at their condo when they were heading out the door.

48.     Plaintiffs were again hurriedly told to sign a stack of documents with minimal explanations and prompted where to sign.

49.     Plaintiffs have no idea what they signed, but it is suspected that buried in the paperwork was the undisclosed PayPal and credit card accounts.

***Successor Liability***

50.     The Wyndham representatives told the Plaintiffs the timeshare was a "good investment" with "resale value" and that the Plaintiffs "could" leave to any of their children in the sisters' Wills.

51.     Plaintiffs were never told that under the Contract's "successors" clause, their children would be automatically liable upon the Plaintiffs' demise for any Mortgages, future fees and costs of the timeshare.

52.     The successor clause was buried in legalese that would be difficult for anyone to comprehend, let alone a rapid contract signing after hours of being worn down, to recognize this as binding on their children and successive generations to ever-rising maintenance fees.

53.     Had the Plaintiffs known that their children and future generations of family members could be held jointly & severally liable for ever-rising maintenance fees, forever into the future, they  have stated that they never would have signed the Contract documents.

*California Public Report, Time-Share*

54.     Plaintiffs didn't recall ever getting, and Plaintiffs cannot find in their Contract documents anything to do with a California Public Report, Time-Share.

55.     And the Plaintiffs certainly were not provided an opportunity to read a California Public Report on timeshares at any time prior to the signing of the Contract.

*Cost per Use*

56.     In the 2 years since the upgrade, Plaintiffs could only book 1 average Midway, Utah room for 2 nights.

57.     This is definitely not the two weeks at high-end, exclusive international destination resorts (like Fiji…), as promised.

58.     Plaintiffs have now discovered that the general public online has better availability than Worldmark "owners" and specifically including booking attempts and under-quality offerings through Defendant RCI.

59.     In essence, the Plaintiffs investment in the timeshare ownership was without any financial benefit to booking online and was actually far less bookable, including booking efforts through Defendant RCI, and the actual cost is tens of thousands of dollars more than if they had never been "Worldmark Owners".

60.     At Plaintiffs' use-rate since the upgrade, factored over the next 10 years, while taking into consideration the PayPal and Visa deceivingly used for additional payments to Wyndham, along with their current mortgage, and the maintenance fee that grew by $400% and will continue to rise, Plaintiffs would have to pay a total cost of about $95,000 over 10 years.

61.     At their current use rate or 2 nights in 2 years, that amounts to about $4,750 per night.

62.     Thus, the public can book a room online with vast selections, and in 1 day, versus a Wyndham owner booking through Defendant RCI up to 11 months in advance through Defendant RCI.

63.     Alternatively, Defendant RCI made the Plaintiffs try to fit into an illusory booking window that is without availability, as these Plaintiffs were asked to attempt this procedure, but that did not work.

64.      The Plaintiffs are Worldmark by Wyndham Members that are called Worldmark "Owners" by sales staff, but are required to pay about 3000% more ($4750 per night) than the general public online for frustration and/or denial of the central purpose of a timeshare use agreement (i.e. booking rooms) due to the booking agent, Defendant RCI—a *booking facilitator* that operated here to tactically frustrate and block *booking access.*

# PLAINTIFF FACTS WITH PARTICULARITY

### *Jemaal and Marlene Knox*

1.     Jemaal Knox and Marlene Knox ("Plaintiffs" herein) purchased a timeshare with Worldmark by Wyndham in 2010 followed by promises for better Use privileges made in their May of 2012 upgrade in San Diego, California

2.     Plaintiffs were promised that they would have access to other timeshare locations with high-quality resorts and hotels through Defendant RCI.

3.      These promises later proved to be untrue through Defendant RCI.

4.      enduring continuous pressure from Wyndham reps and Management,

5.      After sales tactics regarding use features at the last upgrade presentation that lasted about 6 hours, the Plaintiffs agreed to purchase another upgrade to improve use.

6.      In a completely fabricated claim of auto-cancellation, the Plaintiffs were told by Defendant Wyndham's staff (Reps and Worldmark by Wyndham Management) that in order to protect ownership (the investment and use rights), in the previous investment made in ownership, they were forced to act immediately.

7.      Their timeshare was threatened to cease that night on December 31st 2012, so the Plaintiffs had to upgrade by that night.

8.      To protect their investment since 2010 and their resale value, Wyndham staff emphasized that the upgrade was the only alternative and was necessary and with it came increased use rights as was promised by Wyndham staff.

9.      Plaintiffs were told the most recent upgrade was necessary to maintain their ownership (a complete falsity), and would also make it so they could profit from the sale someday.

*Value, Rental, Resale and Costs*

10.     Plaintiffs agreed to the 2016 upgrade purchase when Wyndham representatives convinced her that the previous investment would otherwise be extinguished at midnight and the new package would ensure it would be a valuable investment.

11.     Plaintiffs were told by Wyndham representatives and Management that their investment would become more expensive next year (hours away at time of sale) and that would mean actual "equity" in the investment would occur overnight.

12.     Plaintiffs were told they were buying a "below market investment today" that ensured a future sale where "the dollar-to-point value would be higher" ensuring that the Plaintiffs would profit from that future resale.

13.     Along with this investment feature, the associated use program would be superior.

14.     With easy booking through Defendant RCI, it was explained by Defendant Wyndham's staff how to book and rent-out valuable booking dates for a profit.

15.     Though Wyndham representatives had described the renting as a very simple process, Plaintiffs only later discovered that it is impracticable to rent out their timeshare in the way described by Defendant's staff.

16.     Plaintiffs were disappointed that the use booking through Defendant RCI wasn't as good as it was promised, and the rental process was so difficult it was like having a second job, with very little pay.

17.     Plaintiffs comforted themselves that at least they had what they were told was a "good investment" that they could resell for a profit so they paid the increasing fees from $1,956 to $2,844 over 6 years (about $150 increase per year).

18.     Unfortunately, when Plaintiffs discussed their options with an attorney in 2018, they soon discovered there was no market value at all, and never had been, despite promises from the Wyndham staff and Management.

*Use-Bookings*

19.     Wyndham representatives and management promised Plaintiffs with the 2016 upgrade all their previous problems would be solved.

20.     Plaintiffs discovered that this was not possible because of highly restrictive rules imposed by Defendant RCI, and the lack of availability claimed by the booking service, Defendant RCI, and despite all the money invested, they were still met with unavailability and low-grade lodgings.

*Contract Signing*

21.     After 5 hours of relentless high-pressure sales tactics, Plaintiffs were rushed through the Contract signing in a matter of minutes by the Wyndham closer, a non-lawyer who controlled the documents while giving succinct explanations of the Contract's legal terms and terse directives of where the Plaintiffs should sign or initial.

22.     Those cursory explanations lacked disclosures and contained false and deceptive descriptions of what was actually being signed.

23.     Plaintiffs were not given time to read the Contract's content on their own, and were not able to think it over.

24.     Wyndham representatives and management pressured Plaintiffs to sign as quickly as possible or risk losing this amazing deal.

25.     Plaintiffs were told that the upgrade would allow them to protect their prior investment and future resale value.

***Successor Liability***

26.     The Wyndham representatives told the Plaintiffs the timeshare was a "beneficial asset" and they "could" leave it to their children in their Will.

27.     Plaintiffs were never told, during contract signing or sales presentation, that under the Contract's "successors" clause, their children would be automatically liable for future fees and costs derived from the timeshare. *See Contract, Page 3 at* **¶19 titled "General Provisions"**.

28.     The successor clause was buried in legalese that a lay person would likely never recognize as binding their children and successive generations to ever-rising maintenance fees.

29.     Had the Plaintiffs known that their children and future generations of family members could be held jointly & severally liable for ever-rising maintenance fees, they never would have signed the Contract documents.

30.     As a result, with proper disclosure it would have been certain that no contract would exist between the parties.

***California Public Report, Time-Share***

31.     Plaintiffs do not recall ever getting, and were certainly not provided an opportunity to read, a California Public Report, at any time prior to the signing of the Contract.

32.     Although Plaintiffs have a receipt saying they received the California Public Report, Time-Share, they are positive they never received such a document or any consumer disclosure.

***Cost per Use***

33.     In the ten years of ownership, Plaintiffs were able to book about 6 vacations using their timeshare. The locations were not the high-end, destination resorts as promised.

34.     In essence, the Plaintiffs investment in timeshare ownership was without any financial benefit and was far more costly than booking online that would have been as simple as selecting a desirable hotel and paying for it, even for a same-day booking.

35.     At the Plaintiffs' use-rate through the restrictive bookings of Defendant RCI, there were only 6 stays over 10 years, where they booked just one room for a week each time, while taking into consideration the rising maintenance fees high interest rates, and down payment, the Plaintiffs estimate they have paid a total cost of about $101,000 over 10 years.

36.     That amounts to $17,500 for each 6-night week and that cost is $2,916 per night, for a room that books to the public for $224 a night, at the nicest resort the Plaintiffs were able to book during their vacations.

37.     Thus, the public can book a room online in 1 day (versus 6 months or more in advance through Defendant RCI) with vast selections (versus non-availability through Defendant RCI) for about 1300% less money than Wyndham "Owners" must pay.

## PLAINTIFF FACTS WITH PARTICULARITY

### Cameron Krug and Sarah Mescher

1.     At a Wyndham presentation in California, two California residents Cameron Krug (26) and Sarah Mescher (28), the couple (collectively, "Krug and Mescher" or "Plaintiffs") signed the Contract for about $36,000 (principal only, plus interest and fees) on July 29, 2018.

2.     Plaintiffs attended the presentation in California, in order to receive a "free" 3-day 2-night trip (with limitations and restrictions, it never was used) which was offered by Wyndham representatives they had met at a local Beer Festival.

3.      The Plaintiffs did not want to pay extra expenses (Mr. Krug is an accountant), but the Wyndham staff said they would save significant money by falsifying the true costs and omitting known expenses on a piece of paper used during the presentation, so it appeared the Plaintiffs would have an annual prepaid vacation where they saved money, when they were actually paying a lot more for rooms than they paid online prior to buying Wyndham's booking program.

4.      Wyndham staff also said that there would be no maintenance fees because of the "Wyndham credit card" used to make monthly payments under the installment contract that had use rewards which would offset all maintenance costs.

5.      Wyndham staff further stated that there would be no down payment funds needed because the $5,763.85 down would be on another credit card that said "Wyndham" in huge print on the face of the card, but the card was actually through Barclays Bank as written in small print on the back of the card.

6.      After 3-4 hours of sales-oriented activity, they signed a Contract (No. 00203514872, Member No. 002591800818) that consisted of 21,000 points for Worldmark by Wyndham and a Silver Membership level with a total liability (with down payment and interest) of $69,190.

***Sales Presentation***

7.      Krug and Mescher thought they would have a quick presentation for a free vacation according to the Wyndham reps at the Beer Festival, however, the rep claiming his name was "Kyle Stamps" under rep number "550222" spent well-over 3 hours at what turned out to be a lengthy Wyndham timeshare sales presentation.

8.      Wyndham Management (multiple managers) came to the Plaintiffs' table to help explain any questions Plaintiffs had and to further convince Plaintiffs that they would be saving a lot

money on vacations; one of the managers claimed to be a "Quality Assurance" manager named "Leigh Cledfel" and she doubled as the Wyndham's contract closer.

9.      Based upon on their professional appearance and professional behavior, Plaintiffs believed that Wyndham staff members at the presentation were trustworthy.

10.     Wyndham staff did not provide Plaintiffs with a public offering statement (California Public Report, Time-Share) prior to the commencement of sales discussions, nor prior to the signing.

*Value - Resale*

11.     Plaintiffs felt pressured to buy that day after Wyndham staff claimed it was a limited time offer and the same offer would cost twice as much, stating the purchase price would be $70,000 any other day (versus $36,000) if Plaintiffs came back another time; this was because Plaintiffs were part of a lucky group that day being offered a one-time incentive.

12.     Plaintiffs were told it was a $70,000 asset once it was paid off that could be gifted or put in a Will where the Plaintiffs "could" freely choose which family member or child/children they would leave this valuable asset to, specifically omitting disclosure of known successor liability buried in a clause contained in the Contract. *See* ¶39 below*, and see,* **Installment Agreement at Page 3, ¶20).**

13.     Plaintiffs had the impression that was drilled into the Plaintiffs from the multiple statements made by Wyndham staff (which include Management) that they were purchasing a Worldmark points portfolio at $34,000 that was below the actual market price (about half the market value).

14.     However, when the Plaintiffs decided to get out due to false promises involving use rights, they discovered the points had little or no value.

*Use - Bookings*

15.     Wyndham staff demonstrated how it would be more cost-effective to purchase the timeshare than to book vacations in the typical manner online, using math done on a slip of paper at Plaintiffs' table.

16.     This is a handwritten slip of paper known by the industry as a "deal sheet" that is claimed by resort reps to be the transaction's important facts and numbers, however the consumers are never provided a copy of the deal sheet, and such information was not in the Plaintiff's contract.

17.     Plaintiffs here did not receive a copy of the deal sheet used to calculate their alleged savings over online prices.

18.     Plaintiffs believed that the Wyndham employees had expertise and knowledge in vacations obtainable through the Wyndham Worldmark booking program.

19.     Plaintiffs were shown pictures of specific resorts and hotels that the Plaintiffs would be entitled to book in the U.S. and all over the world, specifically including areas of travel interest to the Plaintiffs located in New Zealand, Ireland, and Italy.

20.     Plaintiffs actual ability to use the timeshare after the purchase was rendered impossible due to a consistent and unyielding lack of availability when attempting to book (even lower grade accommodations) in the promised destinations through Wyndham's booking agent, "RCI".

21.     Wyndham staff never disclosed that Wyndham previously owned and now plans and conspires with the booking agent, RCI, LLC to frustrate or deny bookings.

22.     Defendant Wyndham's contract documents refer to RCI as an:

"external exchange company"

where Defendant "RCI" is held out to the public as a separate entity by Defendant Wyndham through its sales staff and Wyndham's Management.

23.    All of the Plaintiffs' attempts to book a room with this timeshare have failed because RCI consistently claims that accommodations are never available.

24.    Reps claimed that purchasing this timeshare would grant Plaintiffs high trade value. This also allowed for the flexibility to roll points over or borrow from an upcoming year's points, according to the Wyndham employees at the presentation.

25.    Plaintiffs have not found the timeshare to be flexible to book as was described at the presentation, and Plaintiffs have been unable to secure any booking since the purchase.

*Extra Costs and Fees*

26.    Plaintiffs later discovered hidden booking costs and rising maintenance fees that eliminate the savings their timeshare was supposed to provide.

27.    Wyndham staff failed to inform Plaintiffs that membership and use of RCI would be necessary in order to book stays at the international locations described at the point-of-sale.

28.    Plaintiffs signed up for a Wyndham credit card after Wyndham staff claimed the card's rewards program would cover all costs for maintenance fees, which turned out to be false.

29    Wyndham employees told the Plaintiffs that maintenance fees do not typically rise over time, resulting in another increased cost surprise when the fees increased after the first year.

*Contract Signing*

30.    After close to 4 hours of sales, the signing only took a matter of minutes, where Wyndham's contract closer, a non-Lawyer interpreted the Contract terms in her own words very quickly for the Plaintiffs (Video recorded by Wyndham with a Waiver form).

31.     Wyndham's contract closer failed to mention important aspects (omissions) such as extra costs and fees, the ability to rescind the agreement, and the future liability to occur after the demise of the Plaintiffs obligating Plaintiffs' future children (or siblings, if none), who are known as "successors" under the Contract's terms. **Page 3, ¶20, Installment Agreement.**

32.     Wyndham staff had a great deal of paperwork for the Plaintiffs, claiming their regular system was not functional at the time, so everything was manual, however, significant documents were unseen due to the paper shuffling orchestrated by the closer.

33.     Paperwork was entirely controlled and manipulated by Wyndham's contract closer, where she put piles of paperwork all over the room behind her, but never gave the documents to the Plaintiffs to freely examine, and only briefly presenting the signature portion of pages with abrupt explanations and instructions to sign.

34.     Thus, Plaintiffs were unable to review the Contract in any detail due to the amount of paperwork and the method of information delivery used by the closer.

35.     Wyndham's closer would say for each paper they signed, "this paper does…" followed by her interpretation of the contract term.

36.     Such interpretations contained misrepresented terms and/or omissions of material terms that were contained in the actual Contract being signed.

*Successor Liability*

38.     Wyndham staff failed to explain the successor liability clause in Plaintiffs' contract.

39.     Instead, Wyndham representatives claimed this timeshare was a valuable asset that Plaintiffs could gift to friends or family, or pass on to their children (see ¶12 above, described by Wyndham staff including Management as a $70,000 asset).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

40.     Wyndham staff told Plaintiffs the timeshare was something they could place into a Will, leading Plaintiffs to believe it was optional, when liability of "successors" was known by Wyndham to be written into the contractual agreement. **Page 3, ¶20, Installment Agreement.**

*California Public Report, Time-Share*

41.     The public offering statement (known in California as a Public Report - Time-Share) was not provided by Wyndham staff until after signing all the Contract documents (see ¶10 above).

42.     Plaintiffs signed a Public Report disclaimer. It said they had time to read it, but the closer only showed them information about Wyndham's year-end financial totals.

43.     The actual Public Report was on a tablet computer given to the Plaintiffs at the end of the Contract's signing.

44.     No time was afforded by Wyndham for Plaintiffs to read the Public Report.

45.     Wyndham took $5,763.85 down as a deposit on Plaintiff's timeshare sale (see ¶5 above).

46.      Plaintiffs were unaware of the Public Report or its content and its legal significance to their rights as consumers until just before the filing of this lawsuit.

*Cost Per Use*

47.     With a high-interest mortgage of approximately $30,000 ($69,190 after interest and the down payment of about $5700) and ever-rising maintenance and other owner fees (initially $1,800 per year and rising), Plaintiffs would be obligated to pay over the 10 year mortgage period about $90,000 for their Worldmark by Wyndham timeshare ownership.

48.     If Plaintiffs are lucky enough to find availability to book a one-week stay every 2 years or 3 years (they have been unable to book thus far, see ¶20 above), it would amount to about 3-5 uses per 10 years, or $18,000 to $30,000 per week to book a room for a week.

49.     To estimate an average (noting that zero bookings have been available so far) it would be $24,000 to book a room for a week or **$4000 a night**, and even if Plaintiffs booked a luxury room costing $250 per night online, that would be **1600%** more to be a Wyndham "owner".

50.     Plaintiffs were consistently denied (by RCI, it's subsidiary), availability to book the luxury resorts in New Zealand, Ireland, and Italy shown to them at the point-of-sale and promised to be able to book every year with their points (see ¶19 above).

51.     Given Wyndham's false booking promises, Plaintiffs could pay **$90,000** for no benefit.

# PLAINTIFF FACTS WITH PARTICULARITY

### *Kyoungah Lee*

1.      Kyoungah Lee ("Plaintiff" herein) is a California resident who purchased a timeshare through Worldmark by Wyndham in April 2017.

*Sales Presentation*

2.     Plaintiff was staying at a Northern California Wyndham property, Angel's Camp (near Sacramento) when she attended a sales presentation for what was portrayed as not a traditional timeshare, but it was "vacation points" that were a new type of timeshare, where it appeared everything was included for members like international travel flights and cruises.

3.     Plaintiff was clear with Wyndham sales staff that although she was interested in such a timeshare, she would not agree to anything, even a future purchase, without them answering all of her questions, which they did, treating her like a VIP, being respectful, and the reps even gave her complimentary wine during the presentation.

4.     Wyndham sale staff, a sales representative named "Glen" and a Wyndham manager named "Izzy" (who worked there forever and seemed kind of like a Grandfather), answered all

of Plaintiff's questions and made promises [mistruths] that seemed as if the Plaintiff was making a smart and financially responsible decision, because the Plaintiff could: (**1**) rent it for yearly income; (**2**) hold it long-term to sell for a huge profit; or, (**3**) if ever needed, she could cancel the membership at any time, just like a *Gym Membership*.

5.      After 3 hours of talking, Plaintiff asked to take the agreement so she could read it over, but Wyndham staff said she would lose 8,000 points that were only available that day.

### *Predatory Lending Practices - Credit Card Sign Up*

6.      Plaintiff told Wyndham sales staff that she could not afford a timeshare at that time, but with more information, she may purchase in the future.

7.      Plaintiff told Wyndham sales staff that her Capital One credit card was maxed out.

8.      Plaintiff was pushed by Wyndham sales staff, that emphasized it was a "good" financial investment, and they arranged it so she could sign up for a PayPal line of credit as a way to cover the down payment and all future charges without owing anything that day.

9.      Plaintiff was later notified by Wyndham's staff that Wyndham is no longer accepting PayPal line of credit as a valid form of payment for her debt, but the Plaintiff had no other means to cover her costs.

10.     When Plaintiff called Wyndham to discuss the issue, she tried to speak to "Izzy", the manager, but she was just told that *someone* would call her back. No one ever called the Plaintiff back and she subsequently received a late fee, as an additional fee for not having manual payment set up.

11.     When Plaintiff finally got in touch with a Wyndham representative, she was told that Wyndham no longer accepted PayPal line of credit as a form of payment, only PayPal balance

(money people sent her on PayPal or her own money she transferred to PayPal). This was the opposite of what Wyndham sales staff had told her.

***Value - Resale***

12.     Plaintiff was told the interest she was buying was reduced in cost below market value and it was very valuable, so it was a great investment financially, where she could always sell it back for a profit.

13.     One of the central reasons for the purchase was that Plaintiff was getting a great deal so she could always sell it back for a profit (a big reason she acted upon the limited time offer).

14.     Plaintiff was directly told by Wyndham Management that she could cancel at any time, "even on her deathbed", and the longer she owned it, the more profit the sell-back would be.

15.     When she tried to sell it back, Defendant's staff said she must pay-off the mortgage first, another self-serving and predatory act, as even a paid-in-full timeshare would not be marketable.

***Specific Use***

16.   Wyndham sales staff convinced Plaintiff that by signing up on that day, she would be able to use her points at all Wyndham resorts at anytime, anywhere in the world including overseas locations, and cruises were available too, because Wyndham had "partnered" with RCI described as an outside company, for cruises and 5 star resorts, accessible all over the world [and did not disclose that Wyndham had, in fact, created "RCI" as a wholly owned subsidiary to frustrate use rights/bookings].

17.   Plaintiff was told her points would never expire and she could roll them over to save them up even "until she was an old lady".

18.    Plaintiff specifically asked: *So, you're saying if I don't use these points, they accrue, and I can go anywhere I want*. Which without exception, was confirmed by Wyndham staff.

19.    Plaintiff was promised amazing customer service and that Wyndham staff would treat her like a priority.

20.    When Plaintiff tried to book a vacation, the customer service was awful.

21.    Every location and date Plaintiff tried to book was full (no availability), and when she called the individual Wyndham resorts or hotels, she was told that they do not handle bookings and she would need to call the general Wyndham booking number, where she was already told nothing was available.

22.    Plaintiff also discovered that her points expired and if she wanted to roll them over, she would need to pay a large fee. This did not comport with the promises at the point-of-sale, where rollover was automatic, and forever ("until she was an old lady"), where no charges were ever discussed, despite the Plaintiff's highly specific questions.

23.    When Plaintiff looked into booking the overseas locations, she found out that she did not have enough points for the promised resorts and could not afford to pay for them.

24.    Additionally, Plaintiff was never informed that the international locations booked through RCI would require an additional membership fee. At the point-of-sale, she was told she owned Membership rights to stay anywhere that Wyndham had resorts or hotels, which were described as worldwide.

25.    Plaintiff also discovered that without her permission, authorization or consent (in fact, she questioned if there were any fees, and then specifically declined), but Wyndham sales staff had signed her up for the "Mysavings" program, and she received a yearly bill that she is now unable to cancel.

*Rental Income*

26.     Plaintiff was told it would be easy to rent out Wyndham hotel and resorts as a privilege of Membership.

27.     She was told she could charge $400 per night, even though her cost was $292 per night for worldwide bookings at luxury resorts and hotels.

28.     Plaintiff was told that she could do this continuously and it could be very profitable making the purchase appear to be a wise investment.

29.    Plaintiff eventually realized that although Wyndham sales staff told her that she could cover all over her costs, or even make a profit, by renting out as a Wyndham Member, it was impossible because she could not even book a trip for herself.

*Contract Signing*

30.     Plaintiff signed the Contract with the non-lawyer, Wyndham Manager, "Izzy".

31.     Izzy did not allow Plaintiff to read the Contract herself but instead, briefly summarized each page, and the Plaintiff trusted Izzy, because he was kind during the presentation, a very long-term Wyndham Manager, who seemed grandfatherly and trustworthy.

32.     Plaintiff had reliance that all of the answers Izzy provided to her questions were the truth, and thus she fully trusted his guidance.

*Right of Rescission*

33.     Plaintiff asked Wyndham sales staff about her right to cancel the Contract and was told that she could "cancel at any time" in the future.

34.    Plaintiff later discovered this was not true, however, at the point-of-sale such false representations and lack of statutory disclosure of known Rescission Rights, could arguably in

good faith, support Judicial Rescission for the deception and circumvention of known statutory

rescission deadlines, and the avoidance of truthful disclosure of mandates under the law.


***Successor Liability***

35.    Wyndham sales staff told Plaintiff that the timeshare was a valuable asset that she owned

and "could" put in her Will to anyone she wanted, even her nephews, or that she could donate it

to her Church.

36.    Thus, the Plaintiff thought the future ownership was optional and she was led to believe

that the maintenance fees were optional, even in her lifetime, if she did not want to use it in a

given year.

37.    Wyndham sales staff never disclosed to Plaintiff that the Contract's "successors" clause

would automatically upon her death, bind her siblings for all future costs and fees indefinitely.

*See,* **Security Agreement, Section 20, page 3.**

38.    If Plaintiff had known that monetary obligations could be charged to her siblings or any

future children, she never would have agreed to the purchase.


***California Public Report, Time-Share***

39.    Plaintiff was not afforded the opportunity to review a California Public Report about

timeshares prior to signing the Contract.

***Cost Per Use***

40.    Plaintiff has been unable to book a trip in the two years since she purchased the

timeshare.

41.    However, if Plaintiff were able to book a room next year, that would have been 1 use in

3 years, or 3 1/3 uses over the course of the 10-year mortgage.

42.     Taking into consideration the down payment, the Plaintiffs mortgage costs plus high interest and rising maintenance fees, the Plaintiff would pay approximately **$50,000** over 10 years, which at her use rate would be about $15,000 per week (6 nights).

43.     This equates to **$2500 per night** for booking a room, and since no international or upscale accommodations were ever available, that is probably about $200 or less per night for an online booking, which would be about **1200%** more money the Plaintiff would pay as a "Worldmark Member", than the public pays online with vast availability and no obtuse advanced booking requirements (where people can often book and stay on the same day).

# PLAINTIFF FACTS WITH PARTICULARITY

### *Friah Rogers*

1.     Friah Rogers is a 76-year-old widow ("Plaintiff" herein) from Eugene, Oregon, who purchased a timeshare in Depoe Bay, Oregon through Worldmark Resorts in 2016 and then was upgraded in 2018 (there may be more upgrades in this time frame). *See, next to last Section herein for Northern California recent novation purchase in San Francisco.*

### *Original Presentation*

2.     Plaintiff had previously purchased a Wyndham timeshare from a private individual when her husband was alive through their club from another member, and having had positive experiences, she trusted that her timeshare purchase with Worldmark would be the same.

3.     Plaintiff's timeshare gave her points to use at Worldmark locations, but she understood that to mean she owned adequate points for the locations and hotels that they discussed.

*Upgrade Presentation – Predatory lending*

4.      Plaintiff was invited to attend an "Owner's Update Meeting" in Depoe Bay, her home resort, and since she wasn't getting the bookings originally envisioned, she was pleased to attend a meeting *designed to help her get better use* out of her "Worldmark vacation investment".

5.      A very friendly Worldmark sales representative told Plaintiff that she could trust him to make all of her vacation dreams come true, and this was backed up by Wyndham Management, as a Manager with purported high authority told her they were timeshare experts and to trust her rep to lookout for her best interests.

6.      The Worldmark Manager came over and echoed what the rep assured her, and that Plaintiff could trust that the Worldmark sales team would get her the best price, and that anyone, no matter their financial situation, could afford a Worldmark timeshare "investment".

7.      Plaintiff was very hesitant to add more points and repeatedly told Worldmark sales staff (who never left her alone in the many hours she was there) that she did not want to spend more money to upgrade her timeshare.

8.      Worldmark sales staff convinced Plaintiff to sign up for a Wyndham credit card (Barclays credit card on the back), as a way to avoid any payment that day and allow her to pay it off in smaller amounts. Plaintiff has now discovered that the credit card has an extremely high interest rate and it is impossible to pay off due to her current financial situation

9.      These Wyndham upgrades were right in the middle of timing right around the same time period where the <u>Plaintiff became the victim of a con artist (evolving scam over time) that claimed she had won money and after a series of bogus transactions, had stolen $200,000,</u>

however, Wyndham staff ignored this tragedy even though the Plaintiff was in the middle of

losing all this money during these upgrades, where all this lost money was depleting the

Plaintiff's and her deceased husband's 401k account, along with other savings; as a result, the

76 year old Plaintiff is now dependent on a fixed income and this timeshare is devasting to her

financial well-being.

10.     Plaintiff was told she needed more points and the *Diamond Elite* status in order to book

the accommodations she desired at any time all around the world, frequently, and with no extra

costs, along with increased amenities.

11.     Trusting Worldmark sales staff and feeling immense pressure, Plaintiff agreed to

upgrade her timeshare.

12.     This was the because the Plaintiff was ensured by Wyndham Management that all the

use benefits came with a stable and valuable underlying "investment" that was being purchased

at well below the market cost which was also appreciating in value.

13.     This investment grade feature of the purchase was critical because the Plaintiff had

already paid many thousands to *ultimately obtain the money she had won* [the con artist scheme

described in ¶9 above] that she detailed and that at that point (in the middle of these Wyndham

upgrades) she was beginning to be skeptical about even though she still thought *the money she

had won* may pay-off, thus, a stable and safe Wyndham investment was very comforting to the

Plaintiff.

14.     The Plaintiff was also assured this excellent investment would be wonderful for both of

her 2 children that she "could" pass along.

***Value and Resale***

15.     The Wyndham staff including Management, told the Plaintiff that she was getting an exceptional deal because of price reductions that the high-level Manager approved.

16.     The market value was said to be going up, and the reason for the appreciation was because the *Diamond Elite* package benefits were so desirable, as was the underlying real estate property that she would own, along with all the additional resorts Defendant was building, which combined together would shoot up her market resale value.

17.     If Plaintiff didn't buy it then, the increases in market value would make the low offer an impossibility in the future.

18.     However, if the Plaintiff bought right then, she would have "equity" along with the appreciation that meant she could easily sell it in the future for more than what she paid (noting: Plaintiff did attempt resale 2 years later for as low as $32,000 (thinking that was the proper value according to what she was told at the point-of-sale), but received no offers and lost $1000 to the resale [fraud] company.

19.     Importantly, the Plaintiff was told that the resale profit "could" be passed along to her children in her Will so that they would profit from this "valuable asset".

20.     This was further buttressed by the future calls from reps offering the Plaintiff resale properties from other owners, where she was witnessing that other owners were being helped by Wyndham to sell their properties to make more than they paid (yet were still a good deal to buy because the market resale value on the open market had increased so much).

21.     Because of the Defendant's misrepresentations, the Plaintiff thought there was a virtual market for the Wyndham interests to be sold, but given the costs of this and another Wyndham timeshare she was sold, along with the con artist's victimization for $200,000 she was preyed upon for just after this sale (see ¶9 above), the Plaintiff had no money, whatsoever, to invest in these "owner resales" no matter how good the promised returns were.

***Rental Income***

22.     In addition to future resale profits, the Plaintiff was promised immediate yearly income to offset costs, making the 2018 upgrade more viable because of all the expenditures the Plaintiff was incurring from the 2016 upgrade, along with payments to the con artist scheme.

23.     Because of the massive amount of points that the Plaintiff was receiving in the 2018 upgrade, she was sure to have left over points each year, from which she could easily collect rental money.

24.      However, when the Plaintiff checked later on she found out that the rental amount was not that much, and the method of renting was not easy.

25.     Furthermore, the Plaintiff was never told that she would have to pay a couple of hundred dollars in extra fees just to be able to rent at all, if finding a renter was even possible.

***Specific Use***

26.     Worldmark sales staff pushed Plaintiff to upgrade to the *Diamond Elite* level, promising that it would give Plaintiff a huge amount of points to use on more vacations and more availability in booking, alleviating any deficiencies in her prior upgrade purchase expectations.

27.    Worldmark staff and Management discussed and showed Plaintiff locations in "Hawaii" and "New Zealand" and showed her pictures of their 5-star resorts and hotels all over the world and told her that those would all be available for no extra costs with her upgrade.

28.    Plaintiff was promised that she could stay without any extra costs, and book less than a month before she wanted to travel.

29.    Worldmark sales staff said that Plaintiff could bank her points as she liked, without mentioning any form of restrictions, and trade them through RCI.

30.    Plaintiff was told that the properties she would be able to stay at in the pictures she was shown, were 5-star resorts and hotels that were "only accessible by Wyndham owners."

31.    Plaintiff thereafter discovered that the upgrade did not change any of the issues she had with booking a vacation.

32.    Plaintiff still needed to book more than a year in advance (versus "a month" at the point-of-sale).

33.    All of the locations Worldmark had shown her that were "included with" the Diamond Elite statues and her extra points (with no costs), were only available through RCI (which unknown to Plaintiff was a Wyndham-created company originally and alleged as a RICO conspirator herein), and required additional fees and costs that made them cost prohibitive to this fraud victim (see ¶9 above).

34.    Plaintiff went online and found out that her "exclusive" bookings were readily available and without any advanced booking requirements, to anyone in the general public all over the web.

*Contract Signing*

35.     Plaintiff signed the upgrade Contract with a non-lawyer, Worldmark employee.

36.     Plaintiff again emphasized and checked that there would be no further costs if she agreed to sign, and was assured that those were the terms of the contract by the non-lawyer Wyndham employee [contract closer] that interpreted the legal terms of the Contract by essentially making abbreviated false statements about its content.

37.     Plaintiff also confirmed that this was a sound investment, and that she could Will the asset to her children, which she was assured by the contract closer were absolutely true. statements.

38.     The Worldmark employee went through the Contract, summarizing pages, which was described by Plaintiff as "rushed through, really quick" but she was consistently assured by all the professional-seeming Wyndham staff, including the high level Manager, that she was getting a "really great deal".

39.     The Worldmark employee did not allow the Plaintiff to actually read the Contract but she trusted that the Worldmark signing agent was telling her all that she needed to know, and it was truthful.

*Successor Liability*

40.     Plaintiff was advised by non-lawyers that she "could" put the timeshare in her Will, and that it was a very good "asset" for her 2 children and thereafter for her 4 grandchildren if her children "chose" to pass this valuable *legacy* along.

41.     No Worldmark employee ever told Plaintiff that her Contract's "successors" clause would automatically bind those same children (and grandchildren) for all future costs and fees.

42.     Plaintiff has empathetically stated that she never would have purchased this ownership if she knew any debt could pass along to her family to burden them, thus no contract would have ever existed had the truth of successor liability, known by staff and Wyndham Management to be in the Contract (versus the falsity of Will options) had ever been disclosed to the Plaintiff.

***California Public Report, Time-Share***

43.     Plaintiff was not given a California Public Report, Time-Share to read prior to signing the Contract.

***Recent Memories***

44.     Plaintiff, a 76-year-old widow (73 to 75 at the time of the upgrades), trusted Worldmark sales staff and Worldmark Management, but they took advantage of her trust, and now she is trying to piece together memories of perhaps more upgrades.

45.     She had the 2016 timeshare with the upgrade, and Plaintiff thinks Wyndham sold her another upgrade in New York, all in the course of about two years 2016-2018.

46.     After the Worldmark purchase, Plaintiff went to New York for a weekend prior to a United Nations meeting (she is the United Nations delegate representing Oregon, but the UN did not pay for her accommodations), and while there she thinks that she was sold a Club Wyndham [separate] timeshare in 2016.

47.     She thinks she used this for 1 weekend and she was again upgraded to a California timeshare in 2017 for $52,000 that was discounted thousands because of the existing New York timeshare, making it a $46,000 mortgage (about $110,000 estimated after high-interest over 10 years, plus maintenance fees, which she cannot remember how much they are).

48.     As a consequence, for about $110,000 in 2017 obligations, she has only one booking (not at the requested "three stars or higher" Wyndham Canterbury, but at another out-of-the-city Wyndham hotel) and she was <u>required</u> to attend another sales meeting, despite being an owner.

49.     It seems that little value has been derived from this over $100,000 obligation, where the Plaintiff was taken advantage of, as she already owned a Worldmark, plus its upgrade and the underlying New York Wyndham.

50.     Significant, is that later in 2017 when the Plaintiff was upgraded from New York to California, she was on her own trip paid out-of-pocket for a vacation in San Francisco and agreed to an "owners meeting" where she was actually requested that Wyndham take back its timeshare as she was previously assured was an option.

51.     So when the Plaintiff was actually attempting to divest the New York timeshare she clearly didn't need any more money spent on Wyndham timeshares (even when she was there, the United Nations paid for her accommodations) and just wanted what she had in Oregon (the Worldmark) which was itself costing her too much.

52.     Wyndham's Manager said he had authority to move her from New York to San Francisco that was closer to Oregon, and she could always rent out the desirable San Francisco timeshare to lower all her costs and make a profit.

53.      She felt rushed by the Brunch she had to attend in San Francisco with friends, but the Manager pushed her stating that she could get from Branson to the rest of the world with this change over, and then actually obligated the Plaintiff to over $100,000, on the pretense that this would enable her to cover all costs and make a profit.

54.      Tragically, when Plaintiff attempted to actually book San Francisco, there was no availability, and she even attempted several different trips and times, but it never worked, and ultimately she was told, $100,000 in obligations or not, she did not have enough points to book the hotel in San Francisco that she was specifically promised, and would have to upgrade.

55.      Since the Plaintiff couldn't book the hotel for herself, and she could not rent as promised either, it turned out that the *zero cost and extra profits to be made* promise by Wyndham's Management, was later proven to be false.

56.      Additionally, in this 2017 San Francisco upgrade, the Plaintiff was again assured (like the Worldmark upgrade), that she would be owning a "valuable asset" that she "could" pass on through her Will.

57.      And again, there was no California Public Report given to the Plaintiff to read prior to her contract signing, which here was very rushed after delays, in order to get her to her brunch.

*Cost per Use*

58.      It is difficult to tell as the Plaintiff is unsure of many details, but she may have paid as much as $50,000 or more in mortgage payments and pay-off reductions alone, and then there is maintenance and other fees, thus making the total with payments to date, subject to discovery, but close to the $75,000 in controversy threshold.

59.     For the Worldmark purchase and upgrade she was obligated for about $75,000 and use appears to be one week in Munich which appears to be little or no value for the points usage as she had to pay $4,498 out of pocket.

60.     Thus her only *points paid* bookings were probably near Disneyland and Depot Bay, Oregon, and could be (cognitive shortcomings require discovery from the Defendant) just a couple of weeks making costs per use potentially up to **1000% higher** than online, as is the norm for the Plaintiffs in this litigation.

61.     For sure, Plaintiff is a tragic victim of Fraud & Deceit who has endured about $200,000 in con-artist losses and in the middle of these monetary losses, there were monetary losses to Wyndham, and just their awareness of these tragic events detailed in ¶9 should have been a strong impetus to back-off this victim, however, the Defendant with blatant disregard for human compassion, actively and aggressively increased its victimization even further.

62.     Such acts appear recalcitrant of law and utterly *Unconscionable*.

# PLAINTIFF FACTS WITH PARTICULARITY

### *Teresa Sharp (Allred) and Mark Allred*

1.     Teresa Sharp (Allred) (the Plaintiff herein) and Richard Mark Allred (collectively the "Plaintiffs" herein) are Arizona residents who are now divorced, but the Plaintiffs originally purchased a timeshare through Worldmark by Wyndham in 1999, and Teresa Allred ("Plaintiff" in the singular herein refers to her) was the only purchaser on the last novation contract

purchase in Oceanside, California in 2016 and she was the main purchaser throughout the years that started when she was in her 20s.

2.      Since purchasing the original timeshare, the Plaintiff has upgraded nine (9) times, the most recent being in 2016 (only Teresa Allred appears on the 2016 Contract documents).

3.      Plaintiff originally bought a "Worldmark" but was later told by Wyndham reps at an upgrade meeting that since Wyndham had just purchased and taken over Worldmark, the Plaintiff needed to upgrade to Wyndham to be able to use her current ownership.

4.      Wyndham Reps and Management knew that "Worldmark" was bought by Wyndham (under Wyndham's predecessor name Cendant) in 2002 with the Trendwest acquisition which is 14 years prior to the claimed Wydham take-over date herein.

5.       Trendwest and its branded resorts under "Worldmark" was and has been a wholly owned subsidiary of Wyndham for 18 years and the Worldmark brand is currently named: "Worldmark by Wyndham" and perhaps Wyndham has used this name in some way since 1989 because according to their website, "Worldmark by Wyndham was founded in 1989" which unless it is inaccurate, only adds to the years.

6.      The most recent upgrade in 2016 lasted over two hours and involved more high-pressure sales tactics to convince the Plaintiff to upgrade once more, but the fraudulent inducements detailed below began to be discovered from that 2016 sale were revealed in 2017 and 2018.

### Sales Presentations - Upgrades

7.      This case involved 9 upgrades, including the claimed *Worldmark purchase by Wyndham in 2016* (versus 2002, see ¶3-¶4 above), the truth of which was not discovered until 2018.

8.      Wyndham called the Plaintiff several times over the phone to offer upgrades of "unused banked points" at a low discount.

9.      Due to other owners of the timeshare banking their points and being unavailable to use the points, Plaintiff could purchase them for a lower price than the general public (the used banked points system is all fabrication).

10.     If Plaintiff did not agree on that phone call to purchase, all future purchases would be at a much higher rate (again a fabrication as people almost always get discounts in sales).

11.     Most recently, while vacationing in 2016, Plaintiffs were told on check-in that Teresa Allred needed to attend a short "Owner's Meeting."

12.     After 2 hours the Plaintiff had been pressured into yet another upgrade.

13.     Wyndham staff told Plaintiff throughout the 2 hours about the amazing discount she was receiving and the wonderful destinations she could use by rising to a new level with the new points being offered.

14.     Wyndham staff told Plaintiff she could use the points to book flights, cruises, safaris, and European villas, and finally get the use she deserved from all the prior purchases at this new level of ownership.

15.     Plaintiff was assured that she would be able to book vacations easier with this upgrade and she wouldn't have any of the previous problems she had experienced.

16.     Wyndham representatives sold the Plaintiff on the fact that these exclusive resorts she would now have access to, would always have rooms available for Wyndham vacation owners at her level.

*Predatory Lending*

17.     Since signing the original contract in 1999, the Plaintiff was routinely asked to upgrade which she did 9 times.

18.     Between 2011 and 2016, Plaintiff was pressured into upgrading 9 times for bigger and better use rights.

19.     Wyndham representatives would call Plaintiff and tell her that other owners had banked their points and failed to use them.

20.     Due to this oversight, Plaintiff could now buy those points at a low price since they were in a "specific-bucket" (an entirely fabricated construct to fit this fraud scheme).

21.     While vacationing in Oceanside, CA in 2016, Plaintiff was told that she needed to attend a short "Owner's Meeting" with a special deal, that day only, and it was being offered to her because she was such a "valued customer".

22.     But, in this last upgrade, it was necessary and indispensable to protect her entire "investment" she was sold on over the years, because Wyndham had just purchased Worldmark and in order to keep access to all the resorts, Plaintiff needed to upgrade immediately.

23.     Plaintiff was told that because she had no mortgage balance (having paid-off about $125,000 in past Mortgages) these available points had been banked and held for customers, just like her.

24.     Plaintiff was advised to she would receive fantastic use benefits with this Wyndham conversion in the 2016 upgrade, but overriding all of that was the protection of the overall investment like the payments, fees and $125,000 pay-off of mortgages already made which was

all necessitated by the claimed *Wyndham take-over of Worldmark in 2016* which was actually purchased by Wyndham in 2002.

25.    It is estimated, subject to discovery on the full amounts paid which may be higher, to be over $125,000 that was spent on these timeshare purchases with hundreds of thousands of dollars in obligations remaining for principal, interest, and fees over a ten-year mortgage span.

26.    And this harm upon the Plaintiffs has been by both Co-Defendants, wherein Defendant Wyndham's fraud is supported and furthered and collusively planned in conjunction with Defendant RCI, as is supported in detail pursuant to the RICO section herein.

***Value, Resale, and Renting***

27.    In 2016, Wyndham representatives assured Plaintiff that with the $75,000 upgrade, her interest would be very valuable and at this new ownership level, her investment would appreciate in value.

28.    The Plaintiff was told that her overall investment would be an "asset" described as a "Legacy" that she could leave for her children.

29.    Plaintiff was told at the 2016 upgrade, that she could rent out the ownership to cover the payments and fees and even make money.

30.    Wyndham assured Plaintiff renting was a simple process, however upon trying to rent in 2017, this rental assurance was discovered as a deception.

31.    In 2017, Plaintiff called Wyndham and tried to offer all of the points back at the lowest price she had purchased any of them for.

*32.*     Wyndham representatives self-servingly [and deceptively] informed Plaintiff that in order to take back the points, Plaintiff would first need to pay-off the mortgage, even though the Defendant's staff knew the points would not sell, even if the Mortgage was paid-in-full.

***Use- Bookings***

33.     The Plaintiff was told when she did the final 2016 upgrade it would finally be easy to book rooms wherever and whenever she wanted.

34.     This "wherever, whenever" assurance later proved to be untrue in practical attempts with Defendant RCI.

35.     When trying to book vacations the Plaintiff was told by Defendant RCI that there was nothing available and it would require 13 months' advance booking notice.

36.     While trying to book vacations through Defendant RCI in the exact same tropical destinations that she was promised in 2016, like "Fiji" and "Hawaii" the Plaintiff was told when she tried booking 13 months out through Defendant RCI, that not only was there no availability, but also that the "waitlist is completely filled" for those locations.

37.     In practice, because of the constant non-availability through Defendant RCI (despite availability online) and because booking these destinations through Defendant RCI was an impossibility because the "wait list" fills up and there is no new people even for future years, Defendant RCI has eliminated use at these destination, while its partner in collusion sold the Plaintiff herein a timeshare that requires using Defendant RCI for such bookings.

38.     When the Plaintiff looked into booking some international destinations promised by Defendant Wyndham like Paris, she discovered through Defendant RCI that there were no available resorts in Paris or within the surrounding areas.

39.     As a result, Plaintiff has been unable to book any of the vacations through Defendant RCI that she was specifically promised by Defendant Wyndham would be available through Defendant RCI's "wherever, whenever" booking procedures for her new level of ownership in the 2016 novation upgrade contract.

40.     While the Plaintiff has been able to book some vacations over the years, they frequently were not at the exact location or time she desired, and involved a number of months of advance booking and purchasing additional points, and largely, all the rooms were motel-like.

41.     The Plaintiff had been specifically promised that the new 2016 upgrade would cure all the past use problems.

42.     Later discoveries have shown that Defendant RCI has blocked the ability of the Plaintiff to obtain the promised bookings because Defendant RCI's system makes it impossible to book.

*Extra Costs and Fees*

43.      When the Plaintiff originally bought her timeshare in 1999, the Maintenance fees were $20 a month ($240 annually).

44.     The fees have now increased drastically to about $600 a month (about $7,000 annually).

45.     Plaintiff thought that Maintenance fee increases were due to her upgrades, but recently (discovered in 2018) Plaintiff learned that Maintenance fees go up every year, even without an upgrade, which was never disclosed to her.

*Contract Signing*

46.      During the most recent meeting in 2016, Plaintiff was subjected to a 2-hour presentation but it was followed by a quick, fast paced, 10-minute race to sign all the Contract documents.

47.      The representative controlled the documents and directed the Plaintiff to sign or initial in the appropriate areas while denying her any time to read the documents.

48.      The Contract closer offered general explanations and brief summaries (though they were false & deceptive) as to the contract terms contained in the documents that Plaintiff was signing.

*Successor Liability*

49.      The Plaintiff was told that she could consider this membership as an "asset" for her future, and her children.

50.      The representatives informed the Plaintiff that she could leave this timeshare interest in their Will for her and her husband's children.

51.      The staff never mentioned the rising fees or that the debt would be forced upon the Plaintiffs' children.

52.      Plaintiff is sure she never would have signed any of the contracts (the original contract or any of the upgrades) if it had been disclosed that there was any debt liability, whatsoever, that could ever be transferred to their children.

*California Public Report, Time-Share*

53.      <u>After signing</u> the most recent upgrade contract, the representative handed her a stack of papers and called the California Public Report, Time-Share that she was told was supposedly all about "voting information" for the Members.

54.     The rep phrased it as additional resort information, not as a consumer disclosure form, and as a result of this deception the document was not read (discovery in 2018).

***Cost per Use***

55.     Plaintiff has already paid Wyndham over $125,000 through the last upgrade.

56.     The new Mortgage then was about $75,000 with an obligation of $1,500 per month including Maintenance fees just under $2,100 per month [and rising], which is a total obligation of over $200,000 total costs to be paid over a 10-year mortgage period for the 2016 upgrade.

57.     Thus, the money from past money paid ($125,000) and new obligations owed from the 2016 upgrade ($200,000) would be $375,000.

58.     Assuming Plaintiff was able to continue her past use of vacationing twice a year since the 2011 upgrade cycle began, taking into account her new 2016 Mortgage and prior upgrade Mortgages since 2011 (all with high interest), and rising maintenance fees, Plaintiff would pay about $12,500 per week (6 nights), or over $2,000 per night which is approximately 1300% more per night than what it would cost as a non-Wyndham owner booking online.

//

//

//

//

//

//

//

WHEREFORE,

## REQUEST FOR RELIEF

Plaintiffs request that relief be granted and ordered as follows:

1.  For equitably adjudicating or declaring the termination of the Plaintiffs' signed contracts as a matter of law and/or rescission of the contracts Plaintiffs signed;
2.  For general damages in an amount according to proof;
3.  For common law relief, and statutory relief under applicable state laws;
4.  For punitive damages to punish the Defendant and deter such future conduct;
5.  For attorney's fees, court costs, prejudgment interest; and,
6.  For such other and further relief as this Court may deem just and proper.

Dated this 4th day of March 2020.

**THE ABRAMS FIRM**

/Jack Duran Jr./

Jack Duran, CA Bar No. 221704
Attorney for the Plaintiffs

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 (b), Plaintiff requests a jury trial of all issues triable of right by a jury.

.